**David Douglas SMITH, III, et al., Plaintiffs,**

v.

**ST. REGIS CORPORATION; Georgia Pacific Inc.; United Paperworkers International Union; Local Union 371; Local Union 1369, Defendants.**

**No. 3:85–cv–140WS.**

United States District Court, S.D. Mississippi, Jackson Division.

March 31, 1994.

Dixon L. Pyles, Sr., Pyles & Tucker, Jackson, MS, for plaintiffs.

Herbert C. Ehrhardt, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, MS, for St. Regis Corp.

M. Curtiss McKee, Fuselier, Ott, McKee & Shivers, Jackson, MS, for Georgia–Pacific, Inc.

John L. Maxey, II, Steven Mark Wann, Maxey, Pigott, Wann & Begley, Jackson, MS, for United Paperworkers Intern. Union.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Both the plaintiffs and the defendants herein have moved for summary judgment, respectively, pursuant to Rule 56(a) and (b) of the Federal Rules of Civil Procedure.[1]

---

**1.** Rule 56(a) & (b) of the Federal Rules of Civil Procedure provides:

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without sup-

Before the court are the claims of twenty-six (26) plaintiffs, former papermill production and maintenance employees of St. Regis Corporation (hereinafter "St. Regis") at St. Regis' facility in Monticello, Mississippi. Aggrieved over their non-selection as employees of Georgia–Pacific, Inc., (hereinafter "Georgia–Pacific"), after Georgia–Pacific purchased their paper mill from St. Regis, for whom each plaintiff had worked, the plaintiffs herein sue both Georgia–Pacific, Inc., and St. Regis Corporation, as well as plaintiffs' labor unions, the United Paperworkers International Union (hereinafter "UPIU"), and Locals 371 and 1369 of the UPIU (hereinafter "local unions"). Plaintiffs principally contend that the defendant employers breached a collective bargaining agreement, while the union defendants violated their statutory duty to represent fairly the plaintiffs.

Plaintiffs ask this court to order arbitration pursuant to the collective bargaining agreement entered into on January 14, 1984, between St. Regis and the plaintiffs' union representatives, UPIU and the local unions. Either through arbitration or trial before this court, the plaintiffs seek reinstatement and to be made whole for the losses they claim to have suffered as a result of their having been terminated. The major questions to be resolved by this court, say plaintiffs, are (1) whether Georgia–Pacific is the successor or *alter ego* of St. Regis and bound by the terms of the collective bargaining agreement, (2) whether Georgia–Pacific is compelled to proceed to arbitration with regard to the plaintiffs, and (3) whether the union defendants, UPIU and the local unions, are liable to the plaintiffs for unfair representation.

Plaintiffs bring this action pursuant to § 301 of the Labor Management Act, Title 29 U.S.C. § 185.[2] This court's jurisdiction is predicated upon federal question, Title 28 U.S.C. § 1331.[3] Plaintiffs contend that the defendants, St. Regis and Georgia–Pacific, are employers in an industry affecting commerce within the meaning of Title 29 U.S.C. § 142(1) and (3) and § 152. The union defendants, say plaintiffs, are representatives of employees in an industry affecting commerce as defined in Title 29 U.S.C. §§ 142(1), 152 and 185 and are recognized affiliates of the UPIU.

Plaintiffs also assert claims under state law claiming that the defendants have participated in a civil conspiracy to damage the plaintiffs' reputations and bring about termination of the plaintiffs' employment. Finally, plaintiffs assert additional state law claims of tortious interference with plaintiffs' contractual rights by false representations; defamation and disparagement; and intentional infliction of emotional distress.

Having studied the lengthy briefs of counsel, the submitted numerous documents, affidavits, and depositions, and having had on more than one occasion the benefit of oral argument of counsel, this court is persuaded to deny plaintiffs' motion for summary judgment, but grant that of the defendants[4] as to all of plaintiffs' claims.

### PERTINENT FACTS

Plaintiffs claim that they are all residents of Mississippi. Prior to July 16, 1984, each was either a maintenance or a production worker with St. Regis. The parties agree that the UPIU and its local affiliates were the authorized bargaining representatives for maintenance and production workers employed at the paper mill in question which is located in Monticello, Mississippi, (hereinaf-

porting affidavits for a summary judgment in the party's favor as to all or any part thereof.

2. Removed to this court on February 5, 1985, the complaint was filed in the Circuit Court for the First Judicial District of Hinds County on January 14, 1985.

3. 28 U.S.C. § 1331 provides:
 The district courts shall have original jurisdiction of all civil cases arising under the Constitution, laws, or treaties of the United States.

4. This court recognizes that the defendants are not of one voice relative to the defenses they have offered to the plaintiffs' complaint and motion for summary judgment. Where feasible, this court shall refer to the defendants collectively as "defendants;" however, this reference is not intended to impute acquiescence by Georgia–Pacific, St. Regis, the UPIU, or the local unions to any facts or arguments which would be prejudicial to their respective positions herein, or in other litigation pending before this court.

ter the "Monticello mill"); that a collective bargaining agreement between St. Regis, UPIU, and the respective union locals went into effect on January 14, 1984; and that this collective bargaining agreement by its terms was to remain in effect between the bargaining parties, St. Regis, the UPIU, and the local unions, until October of 1986.

Furthermore, the parties agree that St. Regis and Georgia–Pacific entered into negotiations for the sale of certain of St. Regis' assets to Georgia–Pacific in the spring of 1984. The parties also agree that following those negotiations St. Regis and Georgia–Pacific executed an assets purchase agreement on April 27, 1984, which transferred those assets from St. Regis to Georgia–Pacific on July 16, 1984. Among the assets sold by St. Regis to Georgia–Pacific was the Monticello mill.

According to the defendants, before Georgia–Pacific signed the asset purchase agreement with St. Regis, Georgia–Pacific decided that it did not wish to assume liability under any labor contracts which were in force at any of the St. Regis facilities subject to the asset purchase agreement. Furthermore, say defendants, Georgia–Pacific decided that it would not agree to continue the employment of any St. Regis personnel covered by the collective bargaining agreement of January 14, 1984. According to the defendants, Georgia–Pacific insisted that as a condition of the asset purchase agreement St. Regis terminate its hourly employees covered by the collective bargaining agreement and inform them of the procedures they should follow if they wished to become employed by Georgia–Pacific. This was done, say defendants, so that Georgia–Pacific could establish the initial terms and conditions of employment and negotiate new labor contracts at each facility purchased from St. Regis.

After the asset purchase agreement with Georgia–Pacific went into effect on April 27, 1984, defendants claim that St. Regis notified its hourly employees at the Monticello mill of the sale. Thereafter, say defendants, beginning in May, 1984, St. Regis' local management issued a series of notices apprising its employees, including the plaintiffs, about the status of the sale of assets to Georgia–Pacific

and about the procedures Georgia–Pacific expected St. Regis' hourly employees to follow if they wished to be considered for employment with Georgia–Pacific. Union representatives, say defendants, were also informed of the purchase of the Monticello mill at this time.

On or about June 15, 1984, say defendants, Georgia–Pacific officials had a meeting with the local UPIU representatives at which time the union representatives were informed that the takeover date would be July 16, 1984. The UPIU and the local unions were told that Georgia–Pacific would not recognize the collective bargaining agreement in effect from January 14, 1984. However, say defendants, Georgia–Pacific made clear that it would recognize the UPIU and the local unions as the bargaining representatives for hourly workers at the Monticello mill. Hence, conclude defendants, Georgia–Pacific made no attempt to circumvent or undermine union representation at the Monticello mill.

Georgia–Pacific and the UPIU executed a written "effects of sale" agreement wherein Georgia–Pacific made official its intent to recognize the UPIU as the bargaining agent for hourly workers at a Georgia–Pacific controlled Monticello mill. Additionally, say defendants, Georgia–Pacific agreed that there would be no hiatus or temporary close-down of the Monticello mill after April 27, 1984. In return for Georgia–Pacific's recognition of the UPIU and the local unions and the assurance that the Monticello mill would continue operations, the UPIU and the local unions agreed that Georgia–Pacific was not a successor of St. Regis bound by any preexisting collective bargaining agreement.

Then, on July 12, 1984, say defendants, St. Regis notified its hourly employees, including the plaintiffs, that their employment with St. Regis at the Monticello mill would terminate effective July 16, 1984. According to the defendants, all hourly employees at the Monticello mill were notified through their union representatives in May of 1984, orally, in writing, and through subsequent communications, particularly a notice posted on all mill bulletin boards, on July 12, 1984, that all hourly employees' employment with St. Regis would terminate effective July 16, 1984.

Additionally, according to defendants, all hourly employees were told by their union representatives prior to the July 12, 1984, notice that the January 14, 1984, collective bargaining agreement with St. Regis would terminate as of July 16, 1984. Furthermore, say defendants, plaintiffs were told that the UPIU and the local unions would have to negotiate a new contract with Georgia–Pacific and that Georgia–Pacific was going to hire its hourly employees based upon its own job-related criteria—namely, attendance, job performance, safety, and a medical examination.

The parties agree that after the asset purchase agreement went into effect on April 27, 1984, Georgia–Pacific sent an advance team of four persons, including industrial relations specialists, to the Monticello mill. This was done several weeks before the scheduled assets purchase closing date of July 16, 1984, in order to begin preparations for initial staffing of the Monticello mill under the auspices of Georgia–Pacific. According to the defendants, pursuant to the recommendations of the advance team, all former St. Regis bargaining-unit employees were invited to apply for jobs with Georgia–Pacific. Moreover, say defendants, the existing work force at the Monticello mill was treated as a recruiting pool from which Georgia–Pacific would solicit applicants, in much the same manner that Georgia–Pacific might recruit if it were starting a new facility in a community where a competitor had recently shut down.

Defendants contend that Georgia–Pacific informed all applicants that the initial terms and conditions of employment with Georgia–Pacific would be governed by Georgia–Pacific's employee handbook rather than the January 14, 1984, collective bargaining agreement. According to defendants, the Georgia–Pacific advance team made a copy of this handbook available to each applicant and, until Georgia–Pacific subsequently negotiated a collective bargaining agreement with the defendant unions on December 14, 1984, Georgia–Pacific and those employed by it at the Monticello mill followed the terms and conditions of this handbook. The terms and conditions of employment in this handbook, say defendants, differed markedly from the terms and conditions of the collective bargaining agreement of January 14, 1984, and from the new collective bargaining agreement Georgia–Pacific negotiated subsequently with the UPIU and the local unions in December of 1984, after the plaintiffs had been terminated.

According to the defendants, over 400 of the former St. Regis employees, including all 26 of the plaintiffs, submitted written applications for employment with Georgia–Pacific. Between July 16, 1984, and August 10, 1984, say defendants, Georgia–Pacific made offers to all but 40 of the hourly employees of St. Regis. Defendants contend that the employees not hired were denied employment for legitimate cause. No one, say defendants, was denied employment because of union affiliation, age, race, or any other discriminatory reason.

After Georgia–Pacific made its hiring decisions, say defendants, the UPIU and local unions repeatedly met with the 40 employees who were not hired, including the 26 plaintiffs, individually and as groups to discuss what could be done for them. A formal grievance was subsequently filed by the UPIU against St. Regis Corporation and Georgia–Pacific Corporation on or about August 10, 1984, on behalf of the plaintiffs as well as other individuals who were terminated from their employment at the Monticello mill. St. Regis and Georgia–Pacific refused to arbitrate the grievance.

Meanwhile, the UPIU and Georgia–Pacific began negotiating for a new collective bargaining agreement. One of the items which the UPIU and the local unions insisted upon being included in these negotiations was the re-employment of plaintiffs. However, the parties agree, Georgia–Pacific refused to consider this as a proper subject of bargaining and, in its final proposal, refused to include any reference to the plaintiffs for employment. Unable to reach any accord on behalf of the plaintiffs and the other hourly employees who were not hired, the bargaining committee of the UPIU and the local unions presented the final proposal of Georgia–Pacific to the membership of the local unions with a recommendation that the final proposal be rejected. However, the membership

voted to accept the final proposal of the company, and it was ratified by a majority of the members of the bargaining units at the Monticello mill. Negotiations were successfully completed in December of 1984 with the signing of a new collective bargaining agreement fully ratified by a majority vote of the Monticello mill's hourly employees.

While negotiations between Georgia–Pacific and the UPIU for a new collective bargaining agreement were still underway, defendants contend that in August, 1984, local union representatives collected information from those persons who had not been hired by Georgia–Pacific. This information was then transmitted to the legal staff of the international union. On several other occasions, say defendants, union representatives met with terminated employees to discuss what could be done for them. Subsequently, the UPIU filed National Labor Relations Board charges against both St. Regis and Georgia–Pacific for failure to bargain in good faith with the union. This action was taken on behalf of all St. Regis maintenance and production workers who had not been hired by Georgia–Pacific at the Monticello mill, including the 26 plaintiffs. The UPIU also filed charges with the Department of Labor and the Equal Employment Opportunity Commission.

In January of 1985, the UPIU filed suit against St. Regis and Georgia–Pacific on behalf of all former St. Regis production employees who had not been hired by Georgia–Pacific at the facilities acquired from St. Regis. *United Paperworkers International Union, et al. v. Georgia–Pacific Corporation, et al.*, Civil Action No. J85–0403(W). However, the UPIU says it was not informed by the 26 plaintiffs that these plaintiffs planned to file their own lawsuit, the case *sub judice*. Hence, says the UPIU, after it learned of the instant suit filed by the 26 plaintiffs on January 14, 1985, these 26 plaintiffs were dropped from the UPIU's action against St. Regis and Georgia–Pacific.

Since January of 1985, say defendants, the UPIU has pursued on behalf of the other individuals whom Georgia–Pacific failed to hire not only litigation in the District Court for the Southern District of Mississippi, but also the administrative charges filed with the National Labor Relations Board, the Department of Labor, the Equal Employment Opportunity Commission, and various state and local administrative agencies. Moreover, UPIU claims that it has paid all legal costs incurred in pursuit of those claims.

### GEORGIA–PACIFIC'S HIRING PROCEDURE

As stated earlier, the defendants claim that over 400 of the former St. Regis employees, including all 26 of the plaintiffs, submitted written applications for employment with Georgia–Pacific, were given a physical examination, and were interviewed by Georgia–Pacific management. According to the defendants, each applicant had a one-on-one interview with one of the Georgia–Pacific team members before any reference checks were made. This, say defendants, enabled Georgia–Pacific to gain an independent impression of each applicant. Additionally, according to Georgia–Pacific, applicants were asked about their attendance and safety records at St. Regis and about how they believed they had performed in their jobs. Each of the plaintiffs' applications, say defendants, specifically authorized Georgia–Pacific to seek, and St. Regis to disclose, "any information" St. Regis as a prior employer had as to the applicant's "record, performance, attendance and health." Each plaintiff, say defendants, agreed to hold St. Regis "harmless [from] such disclosure" of information. Moreover, say defendants, each applicant was made aware of and agreed to the following:

> *IMPORTANT*—Read the following certification and agreement carefully before signing below.

> In making this application for employment, I certify that the statements I have made are true, complete and correct, *and I agree that any willfully false statements or misrepresentations herein are just cause for Georgia–Pacific to either refuse or terminate my employment.* (emphasis added) Further, I authorize any school, hospital, doctor or former employer to disclose to Georgia–Pacific upon request any information they may have as to my record, per-

formance, attendance and health, and will hold such schools, hospitals, doctors and employers harmless for such disclosure. I ·agree to take the Georgia–Pacific health survey upon request, and authorize Georgia–Pacific in its sole discretion to use the results of such examination and information obtained from schools, hospitals, doctors and former employers in determining my qualifications.

Defendants say that Georgia–Pacific representatives met with the superintendent and usually the assistant superintendent from each of the departments at the Monticello mill after the one-on-one interviews with the hourly employees of the Monticello mill were completed. Defendants refer to these meetings with the superintendents as "reference sessions" where lists of applicants from the Monticello mill were reviewed and considered for employment. According to the defendants, Georgia–Pacific's meetings with the superintendents were intended to be reference checks that would either confirm what each applicant had reported about job performance, safety, and attendance or suggest that there were questions or problems regarding an individual's past performance.[5] Defendants contend that the superintendents who furnished these references to Georgia–Pacific had been directed by their superior, Kenneth M. Forehand, St. Regis' resident manager, to cooperate with Georgia–Pacific and respond to these reference inquiries by providing accurate information concerning each employee's safety, attendance, and job performance.

According to the defendants, the superintendents provided information on that basis, and none of them acted out of ill will or malice toward any employee. No superintendent, say defendants, made any negative comments to the Georgia–Pacific team about the race, sex, union affiliation, use of St. Regis' grievance procedures, or possession of a non-job-related handicap of any applicant

in the course of Georgia–Pacific's reference checks.

· The parties agree that each applicant was examined by a physician and required by Georgia–Pacific to give a urine sample. Defendants say that Georgia–Pacific subjected each urine sample to a drug screen conducted by a professional laboratory and pharmaceutical firm, SmithKline Laboratories. Defendants contend that Georgia–Pacific then hired the "best qualified" candidates, looking at each candidate's past experience, including overall job performance, safety and attendance, and the drug screen. ·

On July 16, 1984, say defendants, Georgia–Pacific extended offers of employment to all but 40 of the former Monticello mill bargaining-unit employees who had submitted applications. That same day, say defendants, each of the applicants who had not been selected, including the 26 plaintiffs, was telephoned by a Georgia–Pacific representative and informed that he or she had not been selected by Georgia–Pacific for employment. According to defendants, the UPIU and the local unions were notified of the number which would not be hired on July 16, 1984, and the names of those persons on the following day. Defendants say that the UPIU asked Georgia–Pacific why the plaintiffs were not hired and, dissatisfied with the answer received, advised Georgia–Pacific that the UPIU intended to fight the refusal to hire the 40 former employees, including the plaintiffs, at the bargaining table and in court.

Georgia–Pacific claims that it did not employ anyone who tested positive for recent use of illegal substances, such as marijuana, cocaine, or heroin, or any undisclosed prescription drugs. If an applicant failed this drug test, says Georgia–Pacific, the individual was rejected for employment regardless of prior job performance, safety or attendance, and regardless of anything anyone at St.

---

**5.** According to the defendants, the Georgia–Pacific team would ask the superintendents if there were any problems with an applicant's safety record, attendance or job performance. If no problems were reported, and unless there were some contrary impression created in the interview, the Georgia–Pacific team would give the applicant an "A" rating on "performance." Furthermore, say defendants, if the superintendents stated that a problem existed, the Georgia–Pacific interview team would inquire further and make notes about it, then independently determine whether, in the light of that information, they would give the individual an "A" for satisfactory rating or a "B" rating indicating less than satisfactory performance.

Regis said about the applicant or the impression the applicant made on the Georgia–Pacific interviewer.

Furthermore, says Georgia–Pacific, 19 of the 26 plaintiffs were rejected for employment because they failed to disclose, in response to a direct inquiry on the Georgia–Pacific medical questionnaire, their current use of drugs which had been detected in the drug screen. This, says Georgia–Pacific, violated the agreement contained in the employment application and provided the basis for rejection for employment of these 19 plaintiffs.

Seven of the plaintiffs, say defendants, were rejected because Georgia–Pacific's interview or reference checks had disclosed, in Georgia–Pacific's judgment, job performance, attendance, or safety problems sufficient to conclude that a more desirable employee could be obtained from among the other applicants. The parties agree that Georgia–Pacific rated seven plaintiffs "B" pursuant to its "A—B" rating system (see footnote 5) and decided not to hire these individuals for reasons other than testing positive on the drug screening test. Those reasons are listed in the plaintiffs' brief as follows:

*Richard E. Hollingsworth*—performance; absenteeism; required close supervision. These comments came from Mickey Little, the St. Regis maintenance manager.

*Johnny Hartzog*—spending too much time on the telephone; equipment failures attributed to Hartzog by his foreman; improper performance as an oiler.

*Kent Lambert*—problems with alcohol and absenteeism according to maintenance manager Mickey Little.

*Mozel Lewis*—on "dead end" job and ineligible for further advancement; improper handling of bulldozer; alcohol problem; hypertension; possible seizures and lost consciousness on the job, presumably due to fumes. These assessments were made by W.H. Lane, the St. Regis wood yard and pulp mill superintendent.

*James Ard*—does not work well with other people according to Thomas P. Gould, Jr.

*Charlie Steen Funchess*—required uncommonly close supervision and did not produce at proper level according to Sam Oldham, superintendent of the mill.

*Amos D. Bridges*—absenteeism; did not produce at proper level; required close supervision; on "dead end" job; all according to Sam Oldham, St. Regis superintendent.

## THE PLAINTIFFS' CONTENTIONS

### a. The Matter of the Collective Bargaining Agreement

Plaintiffs claim that they are beneficiaries of the collective bargaining agreement entered into between St. Regis, UPIU, and the local unions on January 14, 1984, notwithstanding the decision of Georgia–Pacific not to honor the existing collective bargaining agreement at the Monticello mill. Plaintiffs contend that Georgia–Pacific is not only the successor to St Regis' interest in the Monticello mill, but also the "alter ego" of St. Regis. Plaintiffs contend further that they were terminated without cause, having violated no plant rule and having received no hearing. Plaintiffs also contend that they are entitled to have their grievances submitted to arbitration in accordance with the aforesaid collective bargaining agreement and to be reinstated.

After St. Regis and Georgia–Pacific executed the asset purchase agreement on April 27, 1984, plaintiffs contend that these defendants entered into a scheme designed to abrogate the collective bargaining agreement. This scheme, according to the plaintiffs, consisted of Georgia–Pacific requiring St. Regis to terminate all its employees, setting new employment criteria contrary to the terms of the collective bargaining agreement, and obfuscating their ultimate plan by failing to notify St. Regis personnel that they would be terminated.

According to the plaintiffs, the Monticello mill never ceased operations after Georgia–Pacific took over on April 27, 1984. The Monticello mill continued, say plaintiffs, to use the same equipment, purchase from the same suppliers, make the same products, and sell to the same customers under the supervision of virtually the same management personnel. Additionally, say plaintiffs, UPIU

and the local unions were recognized by Georgia–Pacific as the bargaining agent for the hourly employees who formerly worked for St. Regis. Plaintiffs also assert that Georgia–Pacific did not change the essential nature of the employing industry and did not substantially alter the composition of the bargaining unit; that there was no hiatus, no interruption in operations; and that Georgia–Pacific and St. Regis were joint venturers during the period of operation of the Monticello mill between April 27 and July 16 of 1984. All these factors, say plaintiffs, make Georgia–Pacific the *alter ego* of St. Regis and bind Georgia–Pacific to the terms of the collective bargaining agreement. Therefore, plaintiffs conclude, Georgia–Pacific must submit the matter of plaintiffs' continued employment to arbitration.

### b. The Matter of Unfair Union Representation

Plaintiffs argue that UPIU and the local unions knew what St. Regis and Georgia–Pacific were doing and cooperated in the eventual termination of the plaintiffs. For instance, say plaintiffs, union officials knew that Georgia–Pacific intended to cut hourly workers and retain salaried employees. Additionally, say plaintiffs, St. Regis and Georgia–Pacific singled out the plaintiffs for termination by means of drug screening as well as the abrogation of the collective bargaining agreement. Union officials knew about this, say plaintiffs, but failed to take any action.

The act most indicative of unfair representation by the UPIU and the local unions, say plaintiffs, is that the UPIU and local unions agreed with Georgia–Pacific that it was not a successor to St. Regis' obligations with regard to the January 14, 1984, collective bargaining agreement. As a result of this unfair agreement, say plaintiffs, the UPIU and local unions then concluded to plaintiffs' detriment that Georgia–Pacific was within its rights to refuse to honor the terms of the collective bargaining agreement.

Plaintiffs also contend that the UPIU and the local unions refused to file grievances concerning the urine sample procedure followed by Georgia–Pacific. Many of the plaintiffs claim to have never used marijuana despite testing positive for that substance.

One plaintiff stated that even though he had been once convicted of marijuana possession, he had not partaken of it since his conviction. Other plaintiffs admitted prior use of marijuana, but claimed to have ceased the practice at the time they gave their urine samples. All plaintiffs claim that the UPIU and the local unions did little, if anything, to assist them in this matter.

According to the plaintiffs, during negotiations in December of 1984 between the UPIU, the local unions, and Georgia–Pacific for a new contract, the unions attempted to negotiate the reinstatement of the 40 St. Regis hourly workers, including the 26 plaintiffs, not retained by Georgia–Pacific. The parties agree that Georgia–Pacific refused to negotiate this issue. Furthermore, say plaintiffs, Georgia–Pacific threatened to discharge 20 additional workers if it was forced to negotiate the reinstatement issue. Plaintiffs contend that the UPIU and the local unions were intimidated by Georgia–Pacific's threats and refrained from further pursuit of the matter.

### c. The Matter of Drug Screening

Plaintiffs insist that drug screening was improper because the collective bargaining agreement entered into between St. Regis, the UPIU, and the local unions on January 14, 1984, contains no provisions for drug testing or any agreement to submit to such testing by the bargaining unit. This contention that the collective bargaining agreement remained in effect is based solely upon the plaintiffs' assertion that Georgia–Pacific is the alter ego of St. Regis.

According to plaintiffs, drug screening was used by Georgia–Pacific as a reason to discontinue certain employees, notwithstanding that the collective bargaining agreement made no provision for drug screening or physical examinations as a basis for hiring employees. St. Regis, say plaintiffs, entered into a secret agreement with Georgia–Pacific to carry out this plan. Plaintiffs contend they were not told that the true purpose of the physical examinations was drug screening.

According to plaintiffs, each St. Regis employee was given a specimen bottle for ob-

taining a urine specimen. The bathroom door was closed, and no one was present to monitor each person voiding his or her bladder when the urine samples were obtained. Plaintiffs contend that this invalidates the tests.

According to plaintiffs, Georgia–Pacific used a "type–1" test for drug screening. No follow-up test, say plaintiffs, such as a "type–2" was used to confirm the plaintiffs' positive "type–1" tests, despite the concerns of Georgia–Pacific's counsel regarding this matter. Georgia–Pacific's nurse, say plaintiffs, refused to administer "type–2" tests to the plaintiffs despite being told that the "type–2" test was "more reliable."

Finally, with regard to drug screening, plaintiffs say Georgia–Pacific anticipated lawsuits over its drug screening policy. Hence, Georgia–Pacific hired a law firm and consulted with a drug-screening expert at the University Medical Center in Jackson, Mississippi. This, plaintiffs contend, infers some form of improper conduct on the part of St. Regis and Georgia–Pacific.

#### d. *The State Law Claims*

Plaintiffs raise various allegations of common-law torts, including civil conspiracy, interference with existing and prospective contractual relations, defamation, and intentional infliction of emotional distress.

Plaintiffs contend that the use of drug screening as a basis for terminating their employment constitutes a civil conspiracy among the defendants. This conspiracy, say plaintiffs, was contrived by the defendants to cause harm to the plaintiffs' reputations by the use of disparaging statements and misrepresentations constituting defamation. Defendants set out to accomplish their purpose, say plaintiffs, by accusing the plaintiffs of falsifying information on the Georgia–Pacific application for employment regarding use of medications and other drugs. According to the plaintiffs, none of them made any false statements on the Georgia–Pacific employment application, and any assertion that they did so constitutes the misrepresentation and defamation of which the plaintiffs complain.

Additionally, according to the plaintiffs, the drug screening test results of those employees who tested positive were given to Georgia–Pacific's attorney to create the appearance of attorney-client privilege with regard to these documents. Plaintiffs contend that all records of those employees not retained by Georgia–Pacific were transferred to the office of counsel to protect them from discovery; that transfer of the aforesaid test results to counsel's office was accomplished in order to "defraud" the plaintiffs; and that their assertion of fraud is based on the defendants' statement that the plaintiffs' records were being shipped to Watertown, New York, for storage.

These and other actions of the defendants in bringing about the termination of the plaintiffs' employment, say plaintiffs, constitute interference with existing and prospective contractual relations under the collective bargaining agreement of January 14, 1984. All of the defendants' actions taken together, say plaintiffs, constitute intentional infliction of emotional distress.

### CONCLUSIONS OF LAW

From the foregoing, this court is presented with the plaintiffs' claims that St. Regis and Georgia–Pacific have breached the collective bargaining agreement of January 14, 1984, by terminating the plaintiffs' employment without first submitting the matter to arbitration; that the union defendants together with the two companies acted in concert to breach the St. Regis collective bargaining agreement; and that the UPIU violated a statutory duty to represent fairly its bargaining-unit members. These claims are asserted against both the plaintiffs' employer and union affiliation and are alleged to be actionable under section 301 of the Labor–Management Relations Act of 1947, 29 U.S.C. § 185, as amended.

#### A. *Timeliness of the Section 301 Claims*

■ Where, as here, both the employer and the union affiliation are named as defendants in a plaintiff's cause of action, the lawsuit is referred to as a "hybrid" action. Section 301 generally provides federal jurisdiction of "[s]uits for violation of contracts between an employer and a labor organiza-

tion." 29 U.S.C. § 185(a). Moreover, in a "hybrid" action such as the case *sub judice* in which the employees' union and employer are both defendants, the United States Supreme Court's decision in *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), holds that, pursuant to Title 29 U.S.C. § 160(b),[6] such complaint must be filed within six (6) months of the date on which the cause of action accrued. See *Nelson v. Local 854 Dock Loaders & Unloaders of Freight Cars & Barges Union,* 993 F.2d 496, 498–99 (5th Cir.1993) (per curiam).

■ According to the defendants, the very latest date the plaintiffs' cause of action may be said to have accrued is July 12, 1984, the date notice was placed on bulletin boards at the Monticello mill that all employees were to be terminated by St. Regis effective July 16, 1984. The parties agree that the plaintiffs' complaint was filed in the Circuit Court for the First Judicial District of Hinds County on January 14, 1985. Thus, say defendants, the plaintiffs' section 301 complaint was not timely filed on January 14, 1985, since on July 12, 1984, plaintiffs knew or should have known of coming termination.

Additionally, say defendants, various other notices had been posted on the bulletin boards at the Monticello mill prior to July 12, 1984, pertaining to the sale of St. Regis' assets and its effects on St. Regis' employees: notice that Georgia–Pacific would purchase the mill dated April 30, 1984; notices dated May 1, 4, and 14, 1984, that Georgia–Pacific personnel were inspecting the Monticello site and that the sale was progressing; notice dated June 22, 1984, that Georgia–Pacific was beginning to accept applications for employment "in order to staff the mill" and that interviews and physical examinations would be necessary; and distribution of the Georgia–Pacific employee handbook on July 5, 1984, with the warning from St. Regis to its hourly employees that the handbook must not be read by employees during working hours and that violation of this policy would jeopardize chances for future employment with Georgia–Pacific. Any of these notices, say defendants, should have signaled the plaintiffs to take action with regard to their section 301 claims of failure to fairly bargain against Georgia–Pacific and St. Regis and failure to provide fair representation against UPIU and the local unions.

Thus, say defendants, the plaintiffs had ample notice even prior to July 12, 1984, that the collective bargaining agreement of January 14, 1984, would not be honored by Georgia–Pacific; that the plaintiffs' employment was being terminated; that medical examinations would be a condition of employment with Georgia–Pacific; and that the Georgia–Pacific handbook would govern employer-employee relations in the interim until a new collective bargaining agreement was negotiated. Therefore, defendants conclude, pursuant to the six-month limitations period imposed on the so-called "hybrid" section 301 actions, of which this case is an example, the plaintiffs' section 301 claims are time-barred.

Plaintiffs respond that they were not notified of the termination of their employment until after July 16, 1984, notwithstanding the notification of termination of all hourly employees, including the plaintiffs, which was posted on the Monticello mill bulletin boards on July 12, 1984. According to the plaintiffs, the statute of limitations imposed by 29 U.S.C. § 160(b) should not begin running until after the plaintiffs were informed that they would not be hired by Georgia–Pacific. Alternatively, say plaintiffs, the statute of limitations should not be construed to begin running until July 16, 1984, the date the plaintiffs were actually terminated pursuant to the July 12, 1984, notice posted on the Monticello mill bulletin boards.

Defendants cite the Fifth Circuit's decision in *Farr v. H.K. Porter Co.,* 727 F.2d 502 (5th Cir.1984), wherein it was held that the *DelCostello* limitations period begins to run " 'when the plaintiffs either were or should have been aware of the injury itself, not when the plaintiffs became aware of one of

---

6. Title 29 U.S.C. § 160(b) provides in pertinent part:

... *Provided,* That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge ...

the injuries' many manifestations.'" *Id.* at 505, citing *Benson v. General Motors Corporation,* 716 F.2d 862, 864 (11th Cir.1983), and *N.L.R.B. v. Auto Warehousers, Inc.,* 571 F.2d 860, 864–65 (5th Cir.1978). Hence, say defendants, because the plaintiffs knew on July 12, 1984, that their employment was being terminated on July 16, 1984, the *Del-Costello* limitations period began to run on July 12, 1984, the date the plaintiffs either were or should have been aware of the injury, termination of employment. Termination of employment occurred on July 16, 1984, not in August of 1984 when the plaintiffs and others learned that they were not among those being hired by Georgia–Pacific. Knowledge of the July 16, 1984, termination, defendants argue, was received by the plaintiffs or may be imputed to them as of July 12, 1984. Since the plaintiffs knew or should have known by July 12, 1984, that St. Regis intended to terminate their employment, say defendants, the fact that the effective date of that termination was a point in the future is irrelevant under *Farr.*[7]

Accordingly, this court concludes as a matter of law that the plaintiffs' section 301 claims must be dismissed because they were not timely filed. Review of the Fifth Circuit's decision in *Farr* and review of the most recent Fifth Circuit authority leads this court to the inevitable conclusion that July 12, 1984, is the latest date the statute of limitations began to run. This is so because it was on this date the plaintiffs knew or should have known of the acts of the defendants which form the basis of the plaintiffs' present claims, termination of employment with St. Regis and possible breach of the collective bargaining agreement of January 14, 1984. See *Barrow v. New Orleans Steamship Association,* 10 F.3d 292 (5th Cir.1994) (breach of collective bargaining agreement claims accrue, and the limitations clock begins to run, when plaintiff discovers or should discover the acts which are the basis of the plaintiff's

claims); *Wood v. Houston Belt & Terminal Railway,* 958 F.2d 95, 97 (5th Cir.1992) (applying 29 U.S.C. § 160(b) to the Railway Labor Act, the limitations period begins to run when claimants discover, or in the exercise of reasonable diligence should discover, the acts that form the basis of their duty of fair representation claim); *Landry v. Air Line Pilots Association International AFL–CIO,* 901 F.2d 404, 413 (5th Cir.1990) (plaintiffs may be on "inquiry notice" if not actual notice of the facts that form the basis of their claim).

### B. Is Georgia–Pacific the "Alter Ego" of St. Regis?

 In order to overcome the defendants' argument that the plaintiffs' section 301 claims are time barred, the plaintiffs must show that the collective bargaining agreement remained in effect after July 12, 1984, and that Georgia–Pacific was bound by its terms and provisions until October of 1986 because it was the same business entity as St. Regis. The plaintiffs may do so if they can show either that Georgia–Pacific is really the "alter ego" of St. Regis or that Georgia–Pacific and St. Regis constitute a "single employer" under the facts presented. *N.L.R.B. v. Leonard B. Hebert, Jr. & Co., Inc.,* 696 F.2d 1120, 1124–25, *reh'g denied,* 703 F.2d 557 (5th Cir.), *cert. denied,* 464 U.S. 817, 104 S.Ct. 76, 78 L.Ed.2d 88 (1983). A non-signatory to a collective bargaining agreement, such as Georgia–Pacific in the instant case, will be bound by the terms of a prior collective bargaining agreement if found to be the alter ego of the previous employer, St. Regis; or, in certain circumstances, if two business enterprises such as Georgia–Pacific and St. Regis are found to constitute a single employer, the non-signatory, Georgia–Pacific, may be bound to the terms of the prior collective bargaining agreement depending on the facts of the case. *Id.,* 696 F.2d at 1125; *Carpenters Lo-*

---

7. Defendants draw analogy from those EEOC cases holding that the 180 day statute of limitations begins to run when the plaintiff knew or should have known of the challenged employment practice. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) ("Where ... the only challenged employment practice occurs before the termination date, the limitations periods necessarily commence to run before that date."); *Clark v. Resistoflex Co. Div. of Unidynamics,* 854 F.2d 762, 765 (5th Cir.1988); and *Elliott v. Group Medical and Surgical Service,* 714 F.2d 556, 563 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984) (following *Ricks* ).

*cal Union No. 1846 v. Pratt–Farnsworth,* 690 F.2d 489, 511 (5th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). More must be shown by a plaintiff in support of an alter ego assertion than in support of a single employer assertion since it is the former and not the latter which binds a non-signatory to a prior collective bargaining agreement. *Carpenters Local Union No. 1846 v. Pratt–Farnsworth,* at 507 n. 7.

■ Courts decide whether a company is the alter ego of another company, or whether two business enterprises constitute a single employer, by looking to such factors as whether the two enterprises have substantially the same management; the same business purpose; and the same operation, equipment, customers, supervision, and ownership. *Carpenters Local Union No. 1846 v. Pratt–Farnsworth,* at 507–508. Additionally, the alter ego doctrine focuses on whether there is a disguised continuance of the business enterprise being replaced, or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operation, or whether the change of the business enterprise is motivated by anti-union sentiment. *Id.* at 508; 1 Patrick Hardin, James R. LaVaute, and Timothy P. O'Reilly, The Developing Labor Law, The Board, the Courts, and the National Labor Relations Act, 3rd Ed., pp. 816–829 (1992). No one factor is determinative, and not all factors must be present. *Id.* at 819, citing *MIS,* 289 N.L.R.B. 491, 1988 WL 213786 (1988).

Certainly there is no anti-union sentiment present in the instant case. Georgia–Pacific made clear in the initial stages of its takeover of the Monticello mill that the UPIU and the local unions were to remain the bargaining agents on behalf of the hourly employees of the Monticello mill under Georgia–Pacific's auspices. Thereafter, a new collective bargaining agreement was negotiated which went into effect in December of 1984. Georgia–Pacific has done nothing to avoid or undermine the union's role as bargaining agent.

Defendants contend that St. Regis and Georgia–Pacific are and were two separate and publicly-traded corporations, the shares of which were owned by literally thousands of individual and institutional shareholders and run by two distinct boards of directors with nothing in common other than the fact that they competed with each other in roughly the same business. Defendants note further that Champion International Corporation, another publicly-traded corporation into which St. Regis merged shortly after the assets purchase by Georgia–Pacific, remains a Georgia–Pacific competitor today. There remains separate ownership, separate management, separate business purpose, and separate supervision between Georgia–Pacific and St. Regis, even if the type of business and equipment used is substantially the same and the same customers are sought and served by both. Hence, this court can find no basis for any contention that the asset purchase agreement between Georgia–Pacific and St. Regis was some sort of sham transaction or that the entire process was intended to disguise the identity of St. Regis in order to avoid union affiliation.

■ As noted earlier, shortly after Georgia–Pacific announced the names of those former St. Regis employees who would not be hired by Georgia–Pacific, the UPIU pursued various actions on behalf of the plaintiffs and others who were not hired. In one of these actions before the National Labor Relations Board, there was conducted an investigation regarding whether Georgia–Pacific was the alter ego of St. Regis. The Board concluded that the alter ego claim was without merit. While this is an administrative finding without res judicata or collateral estoppel effect in this court, the defendants may use this finding in conjunction with their summary judgment motion, thereby obligating the plaintiffs to demonstrate by affidavit that a genuine issue of material fact exists in spite of the Board's finding. *Smith v. Local No. 25, Sheet Metal Workers Int'l Ass'n,* 500 F.2d 741, 748 n. 4 (5th Cir.1974). The plaintiffs have made no such showing.

A leading National Labor Relations Board decision in the application of the alter ego doctrine is *Crawford Door Sales Company,* 226 N.L.R.B. 1144, 1976 WL 7566 (1976), cited by the Fifth Circuit in *Carpenters Local Union No. 1846 v. Pratt–Farnsworth,* at

507.[8] There, a company that sold and installed garage doors was held to be the alter ego of a liquidated company that engaged in the same business. The two enterprises were owned by members of the same family, had the same management and supervision, used the same equipment and served the same customers. The Board found substantial ownership and control by identical parties which it referred to as the "threshold" determination which must be made in every alter ego case. In the case *sub judice*, there is no identity of ownership and control between Georgia–Pacific and St. Regis and no basis for inquiry beyond the threshold level with regard to the alter ego question.

The Fifth Circuit has opined that finding a non-signatory employer to be the alter ego of the previous employer will depend in great part upon the finding of identity of ownership and control, as well as findings of sham transactions and the presence of anti-union sentiment as the motivation for reorganizing the business structure in question. *N.L.R.B. v. DMR Corporation*, 699 F.2d 788, 790–91 (5th Cir.), *reh'g denied*, 706 F.2d 315, *cert. denied*, 464 U.S. 852, 104 S.Ct. 164, 78 L.Ed.2d 150 (1983), *appeal after remand*, 795 F.2d 472, *reh'g denied*, 798 F.2d 1412 (1986) (interrelation of operations, common management and ownership, and centralized control of labor relations); *Carpenters Local Union No. 1846 v. Pratt–Farnsworth*, at 507–08. None of these factors is present in the instant case.

Accordingly, this court concludes that Georgia–Pacific is not the alter ego of St. Regis and is not obligated in any way to assume or follow the St. Regis collective bargaining agreement upon an alter ego basis.

### C. *Is Georgia–Pacific a "Successor" Bound By the Collective Bargaining Agreement?*

■ Defendants note that neither the collective bargaining agreement of January 14, 1984, nor the asset purchase agreement effective April 27, 1984, contained a "succes-

sors and assigns" clause, which would indicate that the collective bargaining agreement was to apply to subsequent purchasers of the Monticello mill. In *Central States, Southeast & Southwest Area Pension Fund v. PYA Monarch of Texas, Inc.*, 851 F.2d 780, 782 (5th Cir.1988), the Fifth Circuit held that specific language is necessary to impose the duty to refrain from transactions which evade the terms of the collective bargaining agreement or to require the employer to compel the assumption of the collective bargaining agreement upon the purchaser, citing *Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306 (5th Cir.1988) (the purchase contract required assumption of labor related agreements).

Furthermore, say defendants, Exhibit 2 to the deposition of Clifton King dated December 12, 1985, shows that there was an agreement between the UPIU, the local unions and Georgia–Pacific, executed on the day of the closing of the assets purchase and sale. In this agreement, the request of the UPIU that there be no break in operations of the Monticello mill by Georgia–Pacific was granted in return for the agreement of the UPIU and the local unions that Georgia–Pacific would not be regarded as a successor under or bound by any agreement, written or oral, between the UPIU, the local unions and St. Regis. Hence, Georgia–Pacific has done nothing to indicate that it has assumed liability under the collective bargaining agreement of January 14, 1984.

In *N.L.R.B. v. Burns International Security Services, Inc.*, 406 U.S. 272, 286, 92 S.Ct. 1571, 1582, 32 L.Ed.2d 61 (1972), the United States Supreme Court held that a new employer, such as Georgia–Pacific, may be bound as a successor to bargain with the union affiliated with the previous employer. However, the Court said, neither the new employer nor the union was bound to the terms of a previously existing collective bargaining agreement. The Court reasoned that:

the § 301 context should differ from that applied by the National Labor Relations Board in the unfair labor practice context. *Carpenters Local Union No. 1846 v. Pratt–Farnsworth*, at 513.

---

**8.** The Fifth Circuit stated that where alter ego and single employer questions are presented to a district court, there is no reason why the substantive law to be applied by the district court in

... holding either the union or the new employer bound to the substantive terms of an old collective-bargaining contract may result in serious inequities. A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force. work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital. On the other hand, a union may have made concessions to a small or failing employer that it would be unwilling to make to a large or economically successful firm. The congressional policy manifest in the Act (the National Labor Relations Act) is to enable the parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities. Strife is bound to occur if the concessions that must be honored do not correspond to the relative economic strength of the parties.

*Id.,* 406 U.S. at 287–88, 92 S.Ct. at 1582. The *Burns* Court also held that a successor employer is ordinarily free to set the initial terms on which it will hire the employees of a predecessor. *Id.,* 406 U.S. at 293–97, 92 S.Ct. at 1585–86.

Subsequently, in *Howard Johnson Co. v. Detroit Joint Board, Hotel & Restaurant Employees,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), the United States Supreme Court addressed a case where the union plaintiffs sought to compel the hiring of all of the seller's employees by the purchaser through a § 301 action. The Court concluded that no such obligation could be enforced upon the successor-purchaser, stating:

We found [in *N.L.R.B. v. Burns Int'l Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) ] that nothing in the federal labor laws "requires that an employer ... who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is

possible that such an obligation might be assumed by the employer." ... Clearly, *Burns* establishes that Howard Johnson had the right not to hire any of the [seller's] employees, if it so desired.

*Id.,* 417 U.S. at 261–62, 94 S.Ct. at 2243.

Furthermore, in *Fall River Dyeing & Finishing Corp. v. N.L.R.B.,* 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987), the United States Supreme Court reaffirmed the view that a successor employer is under no obligation to hire the employees of its predecessor so long as it does not discriminate against them because of their union affiliation. *Id.,* 482 U.S. at 39–41, 107 S.Ct. at 2234.

In *N.L.R.B. v. Houston Distribution Services, Inc.,* 573 F.2d 260 (5th Cir.), *cert. denied,* 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 705 (1978), the Fifth Circuit found well settled the principle that an successor employer may discharge employees for good cause, bad cause or no cause at all, without violating the National Labor Relations Act, as long as the employer's motivation is not anti-union discrimination or an · attempt to avoid dealing with the union. *Id.* at 264. *Accord N.L.R.B. v. Foodway of El Paso,* 496 F.2d 117, 119 (5th Cir.1974); *Firestone Tire and Rubber Company v. N.L.R.B.,* 449 F.2d 511, 513 (5th Cir.1971).

In the case *sub judice,* Georgia–Pacific purchased the Monticello mill from St. Regis, decided to negotiate its own collective bargaining agreement with the UPIU rather than accept the terms of the collective bargaining agreement of January 14, 1984, and proceeded to hire its own workforce. There is no showing that Georgia–Pacific has attempted to avoid the role of the UPIU and the local unions. Furthermore, there is no showing that Georgia–Pacific refused to hire any former employee of St. Regis due to that employee's union affiliation. In fact, Georgia–Pacific hired all but 40 of the over 400 hourly employees covered by the collective bargaining agreement. Therefore, the court concludes that while Georgia–Pacific may be declared a successor of St. Regis bound to negotiate with the UPIU as the bargaining agent of the hourly employees of the Monticello mill, that issue is moot inasmuch as Georgia–Pacific has agreed to recognize the

UPIU and the local union is as bargaining agents. The court further concludes that there is nothing to support the contention that Georgia–Pacific is a successor to St. Regis so as to be bound by the specific the terms of the collective bargaining agreement of January 14, 1984.

### D. *Plaintiffs' Claim of Unfair Representation*

■ The rule that a union may be found to have breached its duty of fair representation when its conduct is "arbitrary, discriminatory, or in bad faith," *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967), applies to all union activity. *Air Line Pilots Association, International v. O'Neill,* 499 U.S. 65, 67–69, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991), citing *Communication Workers v. Beck,* 487 U.S. 735, 743, 108 S.Ct. 2641, 2647, 101 L.Ed.2d 634 (1988) (not only a union's contract administration and enforcement efforts, but its negotiation efforts as well). Furthermore, a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so outside a "wide range of reasonableness" as to be irrational. *Id.* 499 U.S. at 66, 111 S.Ct. at 1130, citing *Ford Motor Company v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

■ The exercise of a granted power to act on behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf. *Air Line Pilots Association, International v. O'Neill,* 499 U.S. at 73–74, 111 S.Ct. at 1133, citing *Steele v. Louisville & Nashville Railway Company,* 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944). The duty of fair representation is thus akin to the duty owed by other fiduciaries to their beneficiaries, like a trustee to trust beneficiaries. *Chauffers, Teamsters and Helpers, Local 391 v. Terry,* 494 U.S. 558, 110 S.Ct. 1339, 1346, 108 L.Ed.2d 519 (1990).

■ Peaceful settlement of labor disputes is strongly favored, and the federal court considering a union's action must not lose sight of the importance of evaluating the rationality of a union's decision in the light of both the facts and the legal climate that confronted the negotiators at the time the decision was made. *Air Line Pilots Association, International v. O'Neill,* 499 U.S. at 78–80, 111 S.Ct. at 1136, citing *Groves v. Ring Screw Works, Ferndale Fastener Division,* 498 U.S. 168, 173, 111 S.Ct. 498, 502, 112 L.Ed.2d 508 (1990). A union has no obligation to see that all of its members are never adversely affected by any transaction. In *Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), the United States Supreme Court stated:

> We are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another.... Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes.

*Id.,* 375 U.S. at 349–50, 84 S.Ct. at 371–72. Given the wide range of reasonableness allowed a statutory bargaining representative, such as the UPIU and the local unions in the instant case, if an employee claims that the union owes him a more far reaching duty, then he must be able to point to language in the collective bargaining agreement specifically indicating an intent to create obligations enforceable against the union by the individual employee. *United Steelworkers of America v. Rawson,* 495 U.S. 362, 373–75, 110 S.Ct. 1904, 1912, 109 L.Ed.2d 362 (1990).

■ The plaintiffs, in order to establish a breach of the duty of fair representation against the UPIU and the local unions in this case, must "adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Association of Street, Electric, Railway & Motor Coach Employees of America v. Lockridge,* 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971). Negligence or error in judgment on the part of union officials in its representational capacity will not sustain an unfair representation claim as a matter of law. *Nunn v.*

*National Fresh Fruit & Vegetable Co.,* 541 F.Supp. 469, 477 (S.D.Tex.1982), *aff'd,* 703 F.2d 556 (5th Cir.1983).

Moreover, *Chauffeurs, Teamsters and Helpers, Local 391 v. Terry,* 494 U.S. 558, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990), states:

> Because most collective bargaining agreements accord finality to grievance or arbitration procedures established by the collective-bargaining agreement, an employee normally cannot bring a [Section] 301 action against an employer unless he can show that the union breached its duty of fair representation in its handling of his grievance. *DelCostello v. Teamsters,* 462 U.S. 151, 163–64, 103 S.Ct. 2281, 2289–2290, 76 L.Ed.2d 476 (1983). Whether the employee sues both the labor union and the employer or only one of these entities, he must prove the same two facts to recover money damages: that the employer's action violated the terms of the collective bargaining agreement and that the union breached its duty of fair representation.

*Id.,* 494 U.S. at 564, 110 S.Ct. at 1344.

■ The UPIU negotiated agreements with defendants St. Regis and Georgia–Pacific which produced benefits to the membership, including the "effects of sale" agreement wherein Georgia–Pacific agreed to keep the plant running after April 27, 1984. The negotiators for the UPIU and the local unions were legally empowered to exercise discretion to make concessions and accept advantages which they believed would best serve the interest of the parties they represented.

Plaintiffs contend that the UPIU and the local unions ignored the plaintiffs' grievances and failed to file their grievances, yet they offer nothing to contradict the assertion that a formal grievance was filed by the UPIU against St. Regis Corporation and Georgia–Pacific Corporation on or about August 10, 1984, on behalf of the plaintiffs as well as other individuals who were terminated from their employment at the Monticello mill, notwithstanding the refusal of Georgia–Pacific and St. Regis to arbitrate the grievance. Nor do plaintiffs contend that there is a genuine issue of material fact regarding the

UPIU's and local unions' attempts to include re-employment of plaintiffs in negotiations with Georgia–Pacific over a new collective bargaining agreement. The plaintiffs agree that Georgia–Pacific refused to consider this as a proper subject of bargaining and refused to include any reference to the plaintiffs for employment, notwithstanding the efforts of UPIU and the local unions.

Most significantly, the plaintiffs make no response to the assertion of the UPIU and the local unions that they presented the final proposal of Georgia–Pacific to the membership *with a recommendation that the final proposal be rejected.* It was the membership that voted to accept the final proposal of Georgia–Pacific, notwithstanding the recommendation of the UPIU and the local unions.

Moreover, the plaintiffs say nothing in response to the assertion of UPIU and the local unions that information was collected by the UPIU and the local unions from those persons who had not been hired by Georgia–Pacific; that this information was transmitted to the legal staff of the international union; that union representatives met with terminated employees to discuss what could be done for them; that UPIU filed National Labor Relations Board charges against both St. Regis and Georgia–Pacific for failure to bargain in good faith with the union; and that the UPIU filed charges with the Department of Labor and the Equal Employment Opportunity Commission.

The plaintiffs present no evidence to indicate that the conduct of the UPIU or the local unions was arbitrary, discriminatory, or in bad faith, that the duty of fair representation was breached, or that the UPIU and the local unions violated any provisions of the collective bargaining agreement. The court has heard the plaintiffs' contention that the UPIU and the local unions allowed the collective bargaining agreement of January 14, 1984, to be abrogated, and the court rejects that argument. Georgia–Pacific was within its rights when it decided not to assume liability under the existing collective bargaining agreement so long as it did not refuse to recognize the UPIU and the local unions as bargaining agents for the hourly workers.

Therefore, the plaintiffs cannot be heard to contend that the UPIU and the local unions acted in bad faith or arbitrarily by accepting necessarily that decision.

Accordingly, this court finds no genuine issue of material fact supporting the allegations of the plaintiffs that the UPIU and/or the local unions breached the duty of fair representation. Hence, summary judgment is appropriate in regard to this claim.

### E. *The Civil Rights Claims*

 Paragraph 8 of the plaintiffs' complaint contains the following allegations:

Each plaintiff was entitled not to be discriminated against because of race, color, age, sex, national origin, mental/physical handicap.

Georgia–Pacific wilfully violated the contractual rights of each plaintiff as set forth in subparagraphs a–e.

Defendants contend that Paragraph 8 is confined by its terms to the collective bargaining agreement of January 14, 1984. The complaint contains no specific assertions under Title VII,[9] Age Discrimination in Employment Act[10] (ADEA), Equal Pay Act,[11] any Executive Order or other statute or regulation purporting to remedy the matters addressed by this segment of the complaint. No agency or administrative charges were filed or pled claiming these allegations as grounds for relief.

Count I of the plaintiffs' complaint asserts breach of a collective bargaining agreement entered into between St. Regis and its employees on January 14, 1984. According to the plaintiffs, their employment with St. Regis was terminated by Georgia–Pacific wrongfully and without cause. Count II of the plaintiffs' complaint asserts unfair representation against the union defendants, UPIU and the local unions. Count III asserts that the defendants, St. Regis, Georgia–Pacific, and the others, entered into a civil conspiracy to terminate the employment of the plaintiffs. Count IV claims that the agents and employees of St. Regis and Georgia–Pacific interfered with the plaintiffs' contract of employment, thereby causing plaintiffs economic harm. Furthermore, say plaintiffs, the defendants made defamatory allegations against the plaintiffs which caused and are causing emotional distress. However, the complaint makes no other reference to discrimination as a basis for relief.

The plaintiffs' next assertion with regard to civil rights violations comes in paragraph 64 of the plaintiffs' findings of fact in support of summary judgment. The paragraph states:

St. Regis and Georgia–Pacific discriminated against the 26 plaintiffs with respect to age, race and mental/physical handicap in violation of the collective bargaining

---

9. Title 42 U.S.C. § 2000e–2(a) provides:
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, or conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; ...

10. Title 29 U.S.C. § 623 provides in pertinent part:
 It shall be unlawful for an employer—
 (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; ...

11. Title VII, 42 U.S.C. § 2000e–2(a) makes it an unlawful employment practice for an employer "to discriminate against any individual with respect to his *compensation*, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin...." (Emphasis added.)

 The Equal Pay Act, 29 U.S.C. § 206(d)(1) provides in part:
 No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, ...

agreement. (Complaint Par. 8e., Exhibit 1; 29 U.S.C. 2, 621 et seq.; Title VII, Civil Rights Act of 1864, 42 U.S.C. 3 2000e, et seq.; Agee affidavit, Exhibit 00, which is Exhibit 6 in Volume 1, Exhibits in support of plaintiffs' 1989 response; Agee Affidavit, Exhibit PP, which is a part of Exhibit 6 of 1989 responses).

The only substantive exhibit listed by the plaintiffs is the affidavit of Lynn Agee, general counsel for the UPIU. Agee's affidavit mentions oral reports and written documents Agee allegedly received from a former St. Regis management official at the St. Regis Grafton plant, not the Monticello mill. According to Agee, this former St. Regis management official contended that St. Regis had impermissibly screened individuals on the basis of age, race and handicap. Agee's affidavit also refers to the EEOC deposition of Dan Bowling, former personnel manager of St. Regis. According to Agee's affidavit, Bowling stated in his deposition that he believed Georgia–Pacific was engaging in age discrimination and that St. Regis acted in concert with Georgia–Pacific in this matter. Furthermore, Bowling believed that his own termination from his job as personnel manager was due to age discrimination or retaliation for his attempts to avoid age discrimination in the hiring of St. Regis personnel by Georgia–Pacific. Bowling claimed that he was called "grand-dad" and "old-man" by certain Georgia–Pacific personnel. Bowling also stated that 124 salaried personnel throughout all facilities purchased from St. Regis were not retained by Georgia–Pacific. According to Bowling, 78% of these employees were within the protected age group. Bowling said that he found disconcerting a request from the Georgia–Pacific team to prepare a list of St. Regis employees reflecting their respective birth dates.

■ This court has reviewed the affidavit of Lynn Agee and finds no specific assertions on behalf of any of the 26 plaintiffs. Moreover, this court has provided the plaintiffs ample opportunity to present additional evidence with regard to any discrimination. Plaintiffs have not responded. Therefore, this court finds no support for any claims of discrimination. Usually a discrimination case under Title VII is a three-step analysis, the showing of one's prima facie case, the defendant's rebuttal asserting non-discriminatory reasons for actions, and a showing by the plaintiff that the defendant's reasons given in rebuttal are merely a pretext. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The factual inquiry in a Title VII case is whether the defendant *intentionally* discriminated against the plaintiff. Pursuant to Title 42 U.S.C. § 2000e. No such showing has been made by the plaintiffs in this case.

■ As for age discrimination, while the plaintiffs need not prove that age was the sole factor motivating the employer's decision, plaintiffs must still show evidence supporting the contention that age was a determining factor in the sense that they would not have been fired but for the defendants' motive to discriminate on the basis of age. *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988). The Fifth Circuit has stated that it reviews a district court's denial of a JNOV in an ADEA case to determine whether, upon the record, a reasonable trier of fact could conclude that age was a determinative factor in failing to promote or hire, (or terminating), a plaintiff. *Laurence v. Chevron, U.S.A., Inc.*, 885 F.2d 280, 282 (5th Cir.1989); *Hansard v. Pepsi Cola Metro Bottling Co.*, 865 F.2d 1461, 1465 (5th Cir.), *cert. denied*, 493 U.S. 842, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989). Plaintiffs have not submitted the requisite evidence to show that any of them were the possible targets of age discrimination.

Concerning handicap discrimination, plaintiffs fail to refer to any statute or other specific violation. There is no assertion in this case as to what handicap any plaintiff might have or how the defendants failed to perform any duties with regard to equal treatment of handicapped individuals.

In related litigation [12] against St. Regis and Georgia–Pacific, section 503 of the Rehabilitation Act of 1973, Title 29 U.S.C. § 793, is cited which provides in part:

> (a) ... [a]ny contract in excess of $2,500 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that ... the party contracting with the United States shall take affirmative action to employ and advance in employment qualified handicapped individuals as defined in section 706(7) of this title.
>
> (b) ... [i]f any handicapped individual believes any contractor has failed or refuses to comply with the provisions of his contract with the United States, relating to employment of handicapped individuals, such individual may file a complaint with the Department of Labor....

There is a contention in the related litigation that one Richard E. Hollingsworth and others are handicapped persons with statutory rights arising from the refusal of St. Regis and Georgia–Pacific to continue their employment or to develop affirmative action programs to employ and advance qualified handicapped persons. However, these assertions do not also show how Richard E. Hollingsworth or any of the others qualify as "handicapped individuals" as contemplated by 29 U.S.C. § 706(7).

■ The law in this area is clear: an honest belief in a non-discriminatory reason for discharge, even if incorrect, is not discrimination. *Wright v. Western Electric Co., Inc.,* 664 F.2d 959, 964 (5th Cir.1981); *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251 (5th Cir.1977); *Wood v. Exxon Corporation,* 674 F.Supp. 1277, 1285 (S.D.Tex.1987). The plaintiffs have shown nothing to counter the defendants' assertion that 19 of the plaintiffs were not hired because they failed Georgia–Pacific's drug test. There is nothing to counter the defendants' assertion that the other 7 plaintiffs were not hired for good cause based on non-discriminatory reasons.

Therefore, this court finds no basis for an assertion of civil rights violations.

### F. Federal Preemption of the State Law Claims

■ The plaintiffs' primary claims arise under section 301. The plaintiffs' brief says as much when it submits that the major questions to be resolved by this court are (1) whether Georgia–Pacific is the successor or *alter ego* of St. Regis and bound by the terms of the collective bargaining agreement; (2) whether Georgia–Pacific is compelled to proceed to arbitration with regard to the plaintiffs; and (3) whether the union defendants, UPIU and the local unions, are liable to the plaintiffs for unfair representation. This court has found in favor of the defendants with regard to all of these issues. However, the plaintiffs have also asserted common-law torts against the defendants to include civil conspiracy, tortious interference with contractual rights, intentional infliction of emotional distress, and defamation.

The defendants respond that the plaintiffs claims of civil conspiracy, tortious interference with contractual rights and intentional infliction of emotional distress are preempted by federal labor law. Defendants contend that activities arguably subject to Sections 7 or 8 of the Labor Management Relations Act, 29 U.S.C. §§ 157–58, are within the exclusive purview and jurisdiction of the National Labor Relations Board, citing *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In *Garmon,* the United States Supreme Court determined that Congress intended to occupy the field of labor law when it enacted the Labor Management Relations Act and, in so doing, Congress intended to preempt the states from regulating certain types of conduct, thereby vesting the National Labor Relations Board with exclusive jurisdiction over certain controversies. As the *Garmon* Court stated:

> ... that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed

---

**12.** *United Paperworkers International Union v. Georgia–Pacific Corp., et al.,* Civil Action No. J85–0403(W) (S.D.Miss., pending).

with its own procedures, and equipped with its specialized knowledge and cumulative experience:

> Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies.

*Id.,* 359 U.S. at 242–43, 79 S.Ct. at 778.

The Supreme Court went on to state the tests for the *Garmon* preemption as follows:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield.
>
> \*　\*　\*　\*　\*　\*
>
> When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national [labor] policy is to be averted.

*Id.,* 359 U.S. at 245, 79 S.Ct. at 779–80.

The *Garmon* rule, say defendants, prevents states from establishing standards of conduct inconsistent with the Labor Management Relations Act and from promulgating regulatory or judicial remedies for conduct prohibited by the Act, citing *Wisconsin Department of Industry Labor & Human Relations v. Gould, Inc.,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). Noting that conflict is imminent whenever two separate remedies are brought to bear on the same activity, the *Gould* Court said of the *Garmon* rule:

> The rule is designed to prevent "conflict in its broadest sense" with the "complex and interrelated federal scheme of law, remedy, and administration," and this Court has recognized that "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy."

*Id.,* 475 U.S. at 286, 106 S.Ct. at 1061.

The preemptive effect of § 301 was first analyzed in *Teamsters, Chauffeurs, Warehousemen & Helpers v. Lucas Flour Company,* 369 U.S. 95, 103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962), where the Court said that substantive principles of federal labor law must be paramount in the area covered by the statute. Hence, the Supreme Court held that a suit in state court alleging a violation of a provision of a labor contract must be brought under § 301 and resolved by reference to federal law. In *Allis–Chalmers Corporation v. Lueck,* 471 U.S. 202, 212, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985), a case involving a claim by an employee against an employer for tortious breach and bad faith in the handling of a disability insurance plan included in a collective bargaining agreement, the Supreme Court stated that in order for section 301 to be given its proper range, the preemptive effect must extend beyond suits alleging contract violations. Therefore, because the rights asserted by the plaintiff derived from the labor contract, the Supreme Court held that this type suit was preempted by section 301. The Supreme Court noted that the policies regarding section 301 preemption:

> ... require that "the relationships created by [a collective-bargaining] agreement" be defined by application of "an evolving federal common law grounded in national labor policy." The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were

intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract.

*Allis–Chalmers Corp. v. Lueck,* 471 U.S. at 211, 105 S.Ct. at 1911. Thus, argue defendants, the plaintiffs may not evade the preemptive force of § 301 by pleading additional state law claims grounded in the same activity. The Supreme Court has interpreted § 301 of the Labor Management Relations Act as preempting common law causes of action whenever, "resolution of [the] state law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." *International Brotherhood of Electrical Workers v. Hechler,* 481 U.S. 851, 852, 107 S.Ct. 2161, 2163, 95 L.Ed.2d 791 (1987).

The plaintiffs' assertion of civil conspiracy states that the defendants illegally combined to destroy each plaintiff's livelihood. This came about, according to the plaintiffs' brief at paragraph 70, when agents of St. Regis and Georgia–Pacific combined to discontinue the collective bargaining agreement of January 14, 1984. Of course, the decision not to be subject to the specific terms of the collective bargaining agreement was Georgia–Pacific's unilateral decision. This court has already held that Georgia–Pacific was within its rights under the collective bargaining agreement when it decided not to be bound by it because there was no successors or assigns clause which would have required Georgia–Pacific to be bound by the collective bargaining agreement of 1984.

Hence, the plaintiffs' civil conspiracy claims are actually contract claims that arise from St. Regis' termination of the plaintiffs' employment and Georgia–Pacific's failure to hire them. To the extent plaintiffs seek to assert rights allegedly created by the collective bargaining agreement, these claims must be preempted by § 301.

■ The plaintiffs' claim of tortious interference of contract rights and prospective economic advantages is also pre-empted by § 301. The plaintiffs contend that the defendants interfered with the rights of the plaintiffs by discontinuing the collective bargaining agreement of January 14, 1984. Plaintiffs contend that the actual wrong lies in the inducement to break the contract or sever the relationship. However, as the court has previously stated, the decision of Georgia–Pacific not to be bound by the collective bargaining agreement was a unilateral decision, induced by no one, which Georgia–Pacific could make since the terms of the collective bargaining agreement did not require Georgia–Pacific to assume liability as a successor or assignee. This court has found that Georgia–Pacific was not a successor bound by the collective bargaining agreement. Hence, this issue is also preempted under the *Garmon* rule.

■ Furthermore, say defendants, unless the "effects of sale" agreement entered into between Georgia–Pacific, the UPIU and the local unions is invalid, plaintiffs' breach of contract and tort claims must fail since the "effects of sale" agreement expressly terminated the collective bargaining agreement of January 14, 1984, upon which plaintiffs rest their claims to continued employment at the mill. However, say defendants, any attack on the "effects of sale" agreement entered into between Georgia–Pacific, the UPIU and the local unions is barred by the *Garmon* rule since Section 8(a)(5) and (b)(3) of the Act clearly make it an unfair labor practice to bargain in bad faith. Thus, if Georgia–Pacific fraudulently induced the union defendants to breach the collective bargaining agreement, this would be a matter for resolution under § 301. Defendants cite *Parker v. Connors Steel Co.,* 855 F.2d 1510, 1516–18 (11th Cir.1988), holding that a judicial attack on a concessions agreement allegedly procured by fraud was barred under the *Garmon* doctrine. Any such claim, say defendants, lies within the exclusive jurisdiction of the National Labor Relations Board. Plaintiffs have offered nothing contrary to this argument and this court agrees.

Defendants further contend that the claims of civil conspiracy and tortious interference are preempted by *Garmon* to the extent plaintiffs seek to challenge Georgia–Pacific's unilateral implementation of hiring practices and terms and conditions of employment. *See, e.g., Gray v. Local 714, International Union of Operating Engineers,* 778 F.2d 1087 (5th Cir.1985) (claims for interference with contractual relations and wrongful discharge preempted since they "center around the employment relationship"); *Nicholson v. Amalgamated Life Ins. Co.,* 616 F.Supp. 318 (S.D.Miss.1985); *Local 926, International Union of Operating Engineers v. Jones,* 460 U.S. 669, 682–84, 103 S.Ct. 1453, 1462–63, 75 L.Ed.2d 368 (1983) (Section 8(a) preempts common law cause of action for alleged wrongful unilateral breach of contract).

■ Hence, says defendants, the only tort claims not totally preempted are plaintiffs' defamation and intentional infliction of emotional distress claims. Defamation claims are, however, narrowly circumscribed by the Act. In *Linn v. United Plant Guard Workers,* 383 U.S. 53, 64–65, 86 S.Ct. 657, 663–64, 15 L.Ed.2d 582 (1966), the Supreme Court limited the availability of state remedies for defamation in cases such as this one, "to those instances in which the complainant can show that the defamatory statements were circulated with malice." Both defamation and intentional infliction of emotional distress have escaped preemption by the National Labor Relations Act under this standard. *Farmers v. United Brotherhood of Carpenters and Joiners of America, Local 25,* 430 U.S. 290, 297–303, 97 S.Ct. 1056, 1062–65, 51 L.Ed.2d 338 (1977). Recognizing this point, defendants attack the merits of plaintiffs' claim and show that there is no evidence of malice in Georgia–Pacific's hiring process. Furthermore, presuming that there was no preemption under the *Garmon* rule, defendants also show that there is no evidence to support the plaintiffs' other tort claims.

## G. *The Matter of Defamation*

■ Defendants note that nearly all of the plaintiffs testified in their respective depositions that they knew of no facts upon which to found a defamation claim. Instead, the plaintiffs said they had heard rumors in the community that all or some of the former St. Regis employees who were not hired by Georgia–Pacific were not selected because they failed Georgia–Pacific's drug test. Some of the 26 plaintiffs stated in their depositions that Georgia–Pacific told the Equal Employment Opportunity Commission that drugs were involved in the reason for their nonselection. One plaintiff testified that a local union official told him that some former St. Regis employees had not been selected by Georgia–Pacific for a drug-related reason.

Georgia–Pacific admits that it communicated to representatives of the Equal Employment Opportunity Commission its reasons for refusing to hire some of the plaintiffs. However, defendants contend that this information was released only upon demand by the agency during the course of the agency's investigation into charges of discrimination filed against Georgia–Pacific by the plaintiffs. Such statements to an investigating government agency, say defendants, are privileged and protected from a defamation claim by an individual who requested the government agency investigation, citing *Montgomery Ward & Co. v. Harland,* 205 Miss. 380, 395, 38 So.2d 771, 774 (1949) (absolute privilege attaches to employer statements to state unemployment compensation commission), and *Killebrew v. Jackson City Lines Co., Inc.,* 225 Miss. 84, 82 So.2d 648 (1955).

The leading Mississippi case on the existence of the qualified privilege in the employer-employee context is *Louisiana Oil Corporation v. Renno,* 173 Miss. 609, 157 So. 705 (1934). There, the Mississippi Supreme Court set forth the standard that controls the operation and scope of the privilege:

> A communication made in good faith and on a subject-matter in which in which the person making it has an interest, or in reference to which he has a duty, is privileged if made to a person or persons having a corresponding interest or duty, even though it contains matter which without this privilege would be slanderous, provid-

ed the statement is made without malice and in good faith.

*Id.,* 157 So. at 708.

In *Killebrew,* the Mississippi Supreme Court discussed qualified privilege from actionable libel and slander, stating:

The law guards jealously the right to the enjoyment of a good reputation, but public policy, good morals, the interests of society, and sound business demand that an employer, or his representative, be permitted to discuss freely with an employee, or his chosen representative, charges made against the employee affecting the latter's employment. On such occasions there is a qualified privilege, and statements made within the scope of the privilege, in good faith and without malice, are not actionable.

*Id.,* 82 So.2d at 650.

In *Staheli v. Smith,* 548 So.2d 1299 (Miss. 1989), the Mississippi Supreme Court discussed qualified privilege in the employment context:

It is restricted both in scope of an motivation for the communication. In *Hooks v. McCall,* 272 So.2d 925 (Miss.1973), this Court held that "a qualified privilege exists between those directly interested in the same matter and in the absence of malice no cause of actin lies." *Id.* at 927. In *Benson v. Hall,* 339 So.2d 570 (Miss.1976), the Court, relying on *Killebrew v. Jackson City Lines,* 225 Miss. 84, 82 So.2d 648 (1955) ], held "When qualified privilege is established, statements or written communications are not actionable or slanderous or libelous absent bad faith or malice if the communications are limited to those persons who have a legitimate and direct interest in the subject matter." *Id.,* at 573. Further, the opinion stated that "if publication is made to persons outside the circle—those not having a legitimate and direct interest in the subject matter of the communication—the protection of the privilege may not be invoked." *Id.*

*Id.,* 548 So.2d at 1305–06, quoting *Bush v. Mullen,* 478 So.2d 313, 314 (Miss.1985).

In *Chatham v. Gulf Publishing Co.,* 502 So.2d 647 (Miss.1987), the Mississippi Supreme Court recognized two restrictions upon the action for defamation:

The words used must have been clearly directed at the plaintiff.... [and] the defamation must be clear and unmistakable from the words themselves and not the product of innuendo, speculation or conjecture.

*Id.* at 650, quoting *Ferguson v. Watkins,* 448 So.2d 271, 275 (Miss.1984). *Accord Blake v. Gannett Co.,* 529 So.2d 595, 603 (Miss.1988).

Several of the plaintiffs said in their depositions that they had heard rumors in the community that some of them had not been hired because they failed the Georgia–Pacific drug test, but no one could say how the rumors began. One plaintiff said he had heard that the rumors were, "coming from the mill." However, this is not sufficient to show that Georgia–Pacific or any other defendant communicated the information outside the circle of privilege. See *Garziano v. E.I. DuPont DeNemours & Co.,* 818 F.2d 380, 393 (5th Cir.1987) (finding that the statement of one of the defendant's supervisors that there was "talk" about plaintiff's termination in a neighboring town was insufficient to show that information was communicated outside the protected circle of privilege). Plaintiffs have shown nothing to indicate that the defendants have acted maliciously.

Finally, all former St. Regis employees, including the plaintiffs, authorized Georgia–Pacific to make inquiries concerning their prior work performance and health and to use such information in making employment decisions. The language permitting such inquiry appears immediately above the signatures of each of the twenty-six plaintiffs. *See, e.g., Burdett v. Hines,* 125 Miss. 66, 70–71, 87 So. 470, 471 (1921) (similar language held to bar defamation action).

■ Defendants submit that there is nothing offered by the plaintiffs showing that Georgia–Pacific made any statements concerning any of the plaintiffs to anyone other than the plaintiffs themselves, or their agents, or their union in its representative capacity. Publication to one's representative is not recognized as a basis for a defamation

action. *Kirk Jewelers v. Bynum*, 222 Miss. 134, 75 So.2d 463 (1954).

Therefore, this court is unpersuaded by the plaintiffs' speculation that what was· alleged to have been said was either defamatory or a defamatory statement made outside the circle of privilege.

## H. *Intentional Infliction of Emotional Distress*

 Under Mississippi law, in order to recover for intentional infliction ·of emotional distress, the rule once was that the plaintiff had to prove an intentional or at least grossly negligent tort, or negligence accompanied by physical impact. *See Sears Roebuck & Company v. Young*, 384 So.2d 69, 71· (Miss.1980). However, the rule has been relaxed by subsequent decisions so that a plaintiff now need only show emotional injury proximately resulting from negligent conduct, provided that the injury was foreseeable by the defendant. *Strickland v. Rossini*, 589 So.2d 1268, 1275 (Miss.1991).

In *Strickland v. Rossini*, the only evidence offered by the plaintiff came from her boyfriend who said that she was very depressed, upset, and that she went through a lot of stress and worry. The Mississippi Supreme Court found this evidence to be insufficient to justify an instruction to the jury on mental pain and anguish. The Court stated that, "it is absolutely incumbent upon the party seeking to prove damages to offer into evidence the best evidence available [on] each and every item of damage." *Id.*, 589 So.2d at 1274–75.

 In the instant case, the plaintiffs have offered no better proof than that offered in *Strickland v. Rossini*. Plaintiffs claims of intentional infliction of emotional distress are based solely upon their not having been hired by Georgia–Pacific. While one plaintiff said he was concerned because he did not know why he was not hired, several plaintiffs stated in their depositions that they did not intend to make an intentional infliction of emotional distress claim in this lawsuit. Otherwise, there is no proof of

the emotional state of the defendants in this case. Hence, this court finds no basis for the allegation of intentional infliction of emotional distress.

## I. *Tortious Interference with Contractual Relations* [13]

 Under Mississippi law, in order to establish a prima facie case of tortious interference with existing contractual relations, a plaintiff must show that the defendant's acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant. *Galloway v. Travelers Insurance Company*, 515 So.2d 678 (Miss.1987); *Irby v. Citizens National Bank*, 239 Miss. 64, 67, 121 So.2d 118, 119 (1960). To establish interference with a prospective business advantage, a plaintiff must prove that the defendant's acts were intentional and willful; that they were calculated to cause damage to the plaintiff; that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant; and that actual damage resulted. *Nichols v. Tri–State Brick and Tile Company, Inc.*, 608 So.2d 324 (Miss.1992).

 The plaintiffs base their tortious interference claims upon the collective bargaining agreement of January 14, 1984, an agreement Georgia–Pacific could rightfully abrogate so long as it continued to recognize the UPIU and the local unions as the bargaining agents for hourly employees at the Monticello mill. There can be no showing under the circumstance of this case that Georgia–Pacific interfered with any contract right of the plaintiffs, that Georgia–Pacific had no right or justifiable cause to refuse to assume liability under the collective bargaining agreement, or that Georgia–Pacific, St. Regis and the union defendants took their respective actions during the transition period with a harmful purpose. The plaintiffs offer no proof which could show otherwise if presented at trial. Therefore, this court finds no basis for a claim of tortious interference with

13. This court found this claim to be preempted by § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. Nevertheless, the court discusses this issue under state law to provide an additional ground for dismissal.

existing contract right or interference with a prospective business advantage. See *Wagley v. Colonial Baking Co.*, 208 Miss. 815, 850, 45 So.2d 717, 722 (1950) (plaintiff must prove that the defendant acted with the object of injuring the third person rather than primarily ... benefiting the defendant's legitimate interests). *Accord Johnson v. Warnaco, Inc.*, 426 F.Supp. 44, 47 (S.D.Miss.1976); *Martin v. Texaco, Inc.*, 304 F.Supp. 498, 501 (S.D.Miss.1969).

### J. *Civil Conspiracy* [14]

■ The only evidence offered by the plaintiffs concerning a conspiracy is the assertion that certain meetings among Georgia–Pacific and St. Regis representatives and representatives of the UPIU and local unions took place before and after the asset sales agreement was signed on April 27, 1984. The outcome of the alleged conspiracy was that the collective bargaining agreement of January 14, 1984, was dissolved and the plaintiffs were not hired by Georgia–Pacific.

■ A conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully. *Shaw v. Burchfield*, 481 So.2d 247, 255 (Miss.1985). In order to avoid summary judgment, the plaintiffs must offer evidence which supports a finding at trial that the defendants agreed to commit an illegal act. *Crowe v. Lucas*, 595 F.2d 985 (5th Cir.1979). The plaintiffs' allegations are conclusory at best. Hence, this court finds no basis for the state law claim of civil conspiracy.

### CONCLUSION

The United States Supreme Court expressed the standard for summary judgment in *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), as follows:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon a motion against a party who fails to make a showing sufficient to estab-

lish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Id.*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

■ In response to a motion for summary judgment, the nonmoving party is required to respond with proof of a *prima facie* case, sufficient for a jury to enter a verdict in their favor. *Washington v. Armstrong World Industries, Inc.*, 839 F.2d 1121, 1122–1123 (5th Cir.1988), citing *Celotex Corporation v. Catrett*, and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Anderson v. Liberty Lobby, Inc.* says that when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial. *Id.*, 477 U.S. at 249–51, 106 S.Ct. at 2511.

■ Furthermore, Rule 56(c) of the Federal Rules of Civil Procedure mandates summary judgment in any case where a party fails to establish the existence of an element essential to the case and on which that party has the burden of proof. *Celotex Corporation v. Catrett*, 477 U.S. at 323–25, 106 S.Ct. at 2553; *Moore v. Mississippi Valley State University*, 871 F.2d 545, 549 (5th Cir.1989). Rule 56(c) further requires that the court enter summary judgment if the evidence favoring a non-moving party is not sufficient for the jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249–51, 106 S.Ct. at 2511. When the moving party has carried the Rule 56(c) burden, the opposing party must present more than a metaphysical doubt about the material facts in order to preclude the grant of summary judgment. *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corporation*, 475 U.S. 574,

---

**14.** This court found this claim to be preempted by § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. Nevertheless, the court discusses this issue under state law to provide an additional ground for dismissal.

586–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Accordingly, this court finds that summary judgment should be granted in favor of the defendants on all counts of the complaint. The plaintiffs' motion for summary judgment shall be denied. Costs shall be borne by the plaintiffs.

A separate judgment shall be entered in accordance with the local rules.

**SO ORDERED AND ADJUDGED.**