98 F.3d 860
 GARDES DIRECTIONAL DRILLING, Plaintiff-Appellant,
v.
U.S. TURNKEY EXPLORATION CO., et al., Defendants.
LAJFP DRILLING, LTD., Plaintiff-Appellant,
v.
CHEVRON USA, INC., et al., Defendants,
Chevron USA, Inc., et al., Defendants-Appellees.
KERR-McGEE CORP., et al., Plaintiffs,
v.
LAJFP DRILLING LTD., et al., Defendants.
 No. 95-30963.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 5, 1996.
 
 Susan C. Severance, Gachassin & Hunter, Lafayette, LA, for Gardes Directional Drilling.
 Bryan D. Scofield, Paul B. David, Broussard, David and Daigle, Lafayette, LA, for LAJFP Drilling Ltd.
 Jennifer Lynn Davis, McGlinchey, Stafford & Lang, Houston, TX, Skipper M. Drost, Lake Charles, LA, for U.S. Turnkey Exploration Co.
 Patrick Wise Gray, Kerry Michael Massari, Joseph Patrick Hebert, George Graham Arceneaux, III, Liskow & Lewis, Lafayette, LA, for defendants-appellees.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before REYNALDO G. GARZA, DeMOSS and PARKER, Circuit Judges.
 REYNALDO G. GARZA, Circuit Judge:
 
 
 1
 This appeal concerns lien rights on certain property associated with an oil drilling operation in the Gulf of Mexico. Because we find that Louisiana law applies to this controversy and that it provides for personal liability in this instance, we must reverse the district court's grant of summary judgment in favor of the appellees and remand this case for further proceedings, including a determination of the value of the lien property.
 
 I.
 
 2
 In 1977, the United States Department of the Interior, Minerals Management Service ("MMS"), entered into an oil, gas, and mineral lease with several companies, including Kerr-McGee Corp., Chevron USA, Inc., Phillips Petroleum Co., Sonat Exploration Co., Felmont Oil Corp., Cabot Oil & Gas Corp., and Case-Pomeroy Oil Corp. (collectively the "Owners"). The lease encompassed an area entitled East Cameron Block 34 ("Block 34"), located on the Outer Continental Shelf off the coast of Cameron Parish, Louisiana, in the Gulf of Mexico. When production from Block 34 began to diminish in the late 1980's, the Owners decided to let others in on the lease. Accordingly, they entered into a farmout agreement in 1988 which transferred all lease operations to Senior G & A Operating Co. ("Senior") but reserved a revenue interest in any production for the Owners. Senior contracted with U.S. Turnkey Exploration Co. ("U.S.Turnkey") to drill another well on the lease. U.S. Turnkey, in turn, contracted with LAJFP Drilling Ltd., Gardes Directional Drilling, and several other businesses to provide the necessary labor, equipment, and services in connection with the drilling activities alongside the fixed production platforms.
 
 
 3
 This new well proved unsuccessful, however, causing the contractor, U.S. Turnkey, to be unable to pay its subcontractors, including LAJFP and Gardes (collectively the "Providers").[1] The Providers properly filed liens against the property associated with the lease of Block 34 in accordance with the Louisiana Oil Well Lien Act, La.Rev.Stat. Ann. §§ 9:4861, et seq. ("Lien Act"). This property included drilling platforms, employee housing, and a heliport ("lien property"). In June 1989, the Providers filed an action in the 38th Judicial District Court, Cameron Parish, Louisiana, for recognition of their liens. The Owners removed the action to the United States District Court for the Western District of Louisiana asserting federal question jurisdiction under 28 U.S.C. § 1331.[2]
 
 
 4
 Unbeknownst to the Providers, these liens would become very important to their recovery. Both U.S. Turnkey and Senior filed for bankruptcy and did not fully satisfy the debt they owed. An attempt by the Providers to seize an arbitration award rendered in favor of U.S. Turnkey failed as well. The Providers eventually found that their only means of possibly effecting a recovery on the debt would be through their interests in the lien property.
 
 
 5
 The instant litigation came to a head during the period of May to August, 1991. In May 1991, the Owners filed an action in interpleader seeking to bring together all claims against the lien property. Immediately after the commencement of this suit, however, the Owners engaged in a series of maneuvers which form the focus of this appeal.
 
 
 6
 The MMS had, in 1989, ordered the Owners to remove all physical structures from Block 34 by July 1990, notwithstanding that the lease operations had been transferred to Senior. The Owners were able to obtain a one-year extension for compliance with the order, leaving the deadline at July 1991.[3] As this deadline approached, the Owners allegedly began taking bids to determine both the value of the structures and the cost of removing them from Block 34. The winner of the bidding process was Teledyne Movible Offshore ("Teledyne"), which offered to credit the Owners $ 43,000 against the $ 400,000 cost of removing the property and transporting it to shore, if it were allowed to keep the property. The Owners contend that other bidders refused to give the property any value at all. On June 7, 1991, the Owners' counsel informed the Providers that it had obtained the Teledyne bid and requested that they stipulate to the value of the lien property within three days. On June 11, the Providers responded that LAJFP's principals were unavailable and asked for an opportunity to conduct an independent appraisal of the lien property. On June 12, they requested certain documents that they believed would facilitate the appraisal process.
 
 
 7
 Rather than comply with this document request, the Owners, on the same day, approached Judge Richard J. Putnam of the Western District of Louisiana, the "on-duty" judge that day. Judge Putnam was completely unfamiliar with the facts or history of this litigation. The Owners presented him with an ex parte motion to release the Providers' lien rights in exchange for the posting of bond in the amount of $ 43,000, the amount they asserted the lien property was worth based on the Teledyne bid. The Providers' lien, however, was in the amount of $ 1.68 million. Judge Putnam, by order dated June 12 (but not filed until June 14), released the liens and ordered the posting of the nominal bond.
 
 
 8
 By a letter dated June 13, the Owners advised the Providers that the material had been removed from Block 34 and was now onshore. The letter did not, however, inform them that their lien rights had been canceled or that the lien property was already being salvaged. Upon receipt of this letter, the Providers responded, objecting to the removal of the property and again requesting information about the property to help facilitate an independent appraisal of the value of the property. The documents request was ignored.
 
 
 9
 The order accepting the bond and releasing the liens was not filed and mailed to the Providers until June 14, 1991, two days after entry by the judge. The Owners had enjoyed a two-day window in which they were able to remove the property and dispose of it free of the lien rights of the Providers. The Providers began proceedings to have their rights reinstated and, on August 30, Judge Edwin F. Hunter invalidated the ex parte order. Judge Rebecca F. Doherty later amended Judge Putnam's order to properly invoke the court's interpleader jurisdiction and ordered the Owners to deposit a bond in the value of the lien claims. However, on August 9, 1991, while the Providers' motion was pending, the Owners informed them that the lien property had been completely salvaged, leaving no res. This was less than two months after the Owners' instituted their interpleader action.
 
 
 10
 Rather than post the cash bond, the Owners moved to dismiss the interpleader action they had brought. On May 27, 1992, Judge Doherty granted the Owners' motion and dismissed the suit. Judge Doherty further ordered the return of the bond the Owners posted before Judge Putnam in June 1991. Before the Owners moved to dismiss, however, the various subcontractors involved filed numerous counterclaims against the Owners and filed cross claims amongst themselves in what a court at an earlier stage of this litigation described as "an apparent legal free-for-all." Gardes Directional Drilling v. U.S. Turnkey Exploration, 815 F.Supp. 956, 960 (W.D.La.1993). Among the counterclaims was the assertion that the Owners wrongfully disposed of the lien property. Judge Doherty referred a motion by the Providers to consolidate the cases to Judge James T. Trimble, Jr. who, on August 4, 1992, ordered the consolidation of all the cases.
 
 
 11
 The Providers' claim asserted that the Owners were liable under Louisiana tort law and the Louisiana Unfair Trade Practices Act for damages from the Owners' non-compliance with the Lien Act in their disposal of the lien property. Because the lien property, the res, was gone, the Providers were forced to pursue the Owners on a theory of personal liability. On the Owners' motion, the district court, per Judge Nauman S. Scott, granted summary judgment in their favor holding that Louisiana law made no provision for personal liability. It held that the sole remedy provided to lien claimants is in rem, via sequestration of the property. The court further held that whatever lien rights the Providers had previously held were waived by their failure to sequester the property while it was in the Gulf. The Providers appeal.
 
 II.
 A. Standard of Review
 
 12
 We review the district court's decision to grant summary judgment de novo, applying the same legal standard as the district court. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Our review of the district court's interpretations of law, both state and federal, is plenary. Salve Regina College v. Russell, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).
 
 
 13
 B. Application of the OCSLA (and Louisiana) Law
 
 
 14
 The first contested issue on appeal concerns the very law we must interpret. At the time the Owners removed this action, they asserted that the Providers' complaint raised a federal question, namely the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356 ("OCSLA"), which would incorporate Louisiana law. They changed their position at summary judgment, however, arguing that maritime law applied to the case rather than the OCSLA. As a consequence, the Lien Act would, rather than be adopted by federal law, be preempted by it. The district court disagreed with the Owners on this point finding the OCSLA to be applicable. The Owners raise this point in their brief as a basis for finding the Providers' liens invalid. We concur with the district court on this point and therefore reject this argument.
 
 The OCSLA provides as follows:
 
 15
 (1) The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources there from ... to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a state....(2)(A) To the extent they are applicable and not inconsistent with this subchapter or with other federal laws and regulations ... the civil laws of each adjacent State, now in effect and hereafter adopted ... are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf....
 
 
 16
 43 U.S.C. § 1333(a). The OCSLA uses state law to fill gaps in federal law with regard to the law regulating, inter alia, the offshore production of oil. OCSLA operates to extend state law only under certain circumstances, however. In Union Texas Petroleum v. PLT Engineering, 895 F.2d 1043 (5th Cir.), cert. denied, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990), we stated that there are three pre-conditions to this state-law adoption:
 
 
 17
 (1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law.
 
 
 18
 Id. at 1047. The Owners argue that the second and third conditions are not met.
 
 
 19
 They first contend that federal maritime law applies "of its own force," thus obviating the need for any gap filling with Louisiana law. In Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), the Supreme Court undertook a thorough examination of the OCSLA. It first observed that the purpose of the Act "was to define a body of law applicable to the seabeds, the subsoil, and the fixed structures such as those in question here on the outer Continental Shelf." Id. at 355, 89 S.Ct. at 1837. The Congress debated the application of maritime law to operations on the shelf and several bills were introduced which took varying positions. In its final form, the OCSLA "deliberately eschewed the application of admiralty principles" to controversies involving fixed platforms, for the reason that the maritime law was ultimately unsuited to the myriad of legal issues which might result. Id. It was for this reason that the final bill allowed for the incorporation of the law of the adjacent state, to provide for a seamless web addressing every contingency. Nevertheless, in those situations where the maritime law would otherwise apply, it does apply. This is not such a situation.
 
 
 20
 The cases upon which the Owners rely are inapposite, centering on the application of maritime law because of the maritime aspects of an underlying contract. The Owners agree that there was no contract here between themselves and the Providers. Rather, they argue that the contract that existed between the Providers and U.S. Turnkey was governed by maritime law and that this law, therefore, governs these proceedings. We cannot accept this argument. The claim in this case is to enforce rights provided under the Lien Act, specifically the right to hold the owner of a lease liable to subcontractors for the debts of a contractor operating on the site. This claim arose from services the Providers gave to U.S. Turnkey; that there was a contract which detailed the working relationship between these entities is irrelevant. The cases cited by the Owners, such as Smith v. Penrod Drilling Corp., 960 F.2d 456 (5th Cir.1992) and Theriot v. Bay Drilling Corp., 783 F.2d 527 (5th Cir.1986), deal explicitly with contract claims, e.g., indemnity provisions, whereas the claim here is extra-contractual. As such, the saltiness of the contract between the Providers and U.S. Turnkey does not mandate the application of maritime law.
 
 
 21
 The Owners next contend that application of the Lien Act would be inconsistent with federal law. They argue that the MMS order, an order from a federal agency, directing them to remove the lien property from Block 34 runs counter to duties prescribed by the Lien Act. We reject this argument. The MMS ordered the Owners to remove the property from Block 34 by July 1991; it did not require the Owners to dispose of the property without providing notice to the Providers. It is plain that the action to which the Providers have objected is not the removal of the lien property from Block 34, but rather the disposal of that property. The Lien Act proscribes both. The Owners were not subject to conflicting duties here with respect to disposal and we therefore find no inconsistency between federal and state law.
 
 
 22
 We note that the first pre-condition enumerated in Union Texas Petroleum, jurisdiction under § 1333(a)(1), is satisfied given that this controversy concerns a drilling platform on the shelf. Because Block 34 sits off the coast of Cameron Parish, the "adjacent state" in this situation is Louisiana. Accordingly, under § 1333(a)(2)(A), the law of the state of Louisiana is adopted as surrogate federal law.
 
 C. The Rights of the Providers
 
 23
 The Lien Act, La.Rev.Stat. Ann. § 9:4861 et seq., serves as our starting point in applying Louisiana law. It provides that those who provide labor or other services in connection with the drilling of a well in search of gas or oil have a privilege on all well production and on all equipment involved in the drilling of the well. Moreover, it provides that the owners of a drilling site are liable to subcontractors for the unpaid debts of an insolvent contractor. The Providers asserted rights under this statute as they met the statutory language. They, of course, only filed against the equipment since there was no production from the wells. They properly recorded the liens in the offices of Cameron Parish in 1989 and timely brought suit for recognition and enforcement of these liens.[4]
 
 
 24
 The Providers concede that, in the typical case, a lienholder only has recourse against the encumbered property. But they argue that this is not the typical case and that Louisiana law affords them an in personam remedy here. Two questions must be answered in connection with our analysis, the first being whether the Lien Act itself precludes an in personam remedy. If not, we must decide whether other provisions of Louisiana law serve as a vehicle for recovering damages. These issues are addressed in turn.
 
 1. Limitation of Remedy
 
 25
 It is undisputed that the Providers had the right to levy on the property under the Lien Act. The general remedy for a lienholder when it discovers that the owner of encumbered property seeks to "conceal, dispose of, or waste the property" is to have the property seized via a writ of sequestration. La.Code Civ. Proc. Ann. art. 3571. The Providers did not proceed via this writ.[5] That the law gave the Providers a remedy in the ordinary situation does not answer the question before us because this is not the typical situation. Here, the Owners removed the property pursuant to a valid legal order which trumped the Lien Act, but then disposed of the property without providing notice to the lienholders.
 
 
 26
 The Lien Act appears silent on this point. It states only that a lienholder "may" proceed via sequestration; it does not, by its own words, limit a lienholder to this remedy. Our interpretation of the Lien Act is greatly assisted by the Supreme Court of Louisiana's recent decision in Guichard Drilling Co. v. Alpine Energy Services, 657 So.2d 1307 (La.1995). In Guichard, the court noted the "broad and far reaching protection to providers of labor and furnishers of material" that the Lien Act established. Id. at 1311. The court stated that "Louisiana courts have often times construed the Oil Well Lien Act in a manner which will effectuate its purposes, and have refused to erect artificial barriers to its enforcement." Id. at 1313. To this end, the courts have decided that lien claimants are not limited to proceeding via writ of sequestration. Id. (citing Frank's Casing Crew & Rental Tools, Inc. v. Carthay Land Co., 212 So.2d 161, 164 (La.App. 4th Cir.1968)).
 
 
 27
 We are ultimately convinced that the Lien Act does not prohibit an action for damages here. The Lien Act prohibits the actions undertaken by the Owners but would, under the Owners' reading of it, leave the Providers without remedy. For us to follow the Owners' argument would run counter to the legislature's intent in enacting the statute.
 
 2. Personal Liability under Louisiana Law
 
 28
 Under the Lien Act, the Owners were obliged to obtain written consent from the lienholders before disposing of the lien property as they did. La.Rev.Stat. Ann. § 9:4861.2(A). The Lien Act allows for the owner of property subject to a lien to bond or secure such claims by depositing a bond in an amount equal to the lien claim, attorney's fees, plus one-fourth. La.Rev.Stat. Ann. § 9:4867(A). While this option was available to the Owners, they elected not to avail themselves of it, leaving us with the task of deciding what Louisiana law provides as a remedy in this unique circumstance.
 
 
 29
 That the Lien Act does not preclude personal liability does not mean that Louisiana law otherwise provides for it. The Providers set forth alternative bases for liability: article 2315 of the Civil Code and the Louisiana Unfair Trade Practices Act, La.Rev.Stat. Ann. §§ 51:1401, et seq.[6] The district court did not address either of these theories in its order, finding as it did that the Lien Act itself proscribed an in personam action. We find that the Providers may proceed under article 2315 but not under the Unfair Trade Practices Act.
 
 
 30
 Article 2315 of the Civil Code establishes that civil wrongs are compensable in the form of money damages. In Mart v. Hill, 505 So.2d 1120 (La.1987), the Supreme Court of Louisiana applied a "duty-risk" analysis to determine whether liability is established under 2315. This analysis involves four questions: 1) was the conduct in question a cause-in-fact of the resulting harm?; 2) what, if any, duties were owed by the respective parties?; 3) were the requisite duties breached?; 4) was the risk, and the harm caused, within the scope of protection afforded by the duty breached? Id. at 1122. Viewing the facts in the manner most favorable to the Providers, we find that the answers to these questions create the potential for liability under this article.
 
 
 31
 First, the resulting harm here was the inability of the Providers to realize damages from the sale of the lien property. It is clear that the Owners' actions in disposing of the property caused this harm. Second, the Owners clearly owed the Providers a duty under Louisiana law not to dispose of the property as they did; the Lien Act specifically makes it illegal to do so. La.Rev.Stat. Ann. § 9:4861.2. Third, the Owners breached this duty by disposing of the property while posting a bond in an amount far below that required by the Lien Act. Finally, the Lien Act clearly contemplates the situation where an owner wants to take action with respect to an encumbered item. Section 9: 4867 spells out a procedure--not, of course, followed here--for an owner to follow in posting bond. We conclude that the Providers properly make out a claim here for money damages under article 2315 to the extent of the injury caused to them by the Owners' non-compliance with the Lien Act.
 
 
 32
 The Louisiana Unfair Trade Practices Act creates a cause of action available to "[a]ny person who suffers any ascertainable loss of money or movable property, ... as a result of the use or employment by another person of an unfair or deceptive method, act or practice...." La.Rev.Stat. Ann. § 51:1409. The Act defines "person" broadly as a "natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity." La.Rev.Stat. Ann. § 51:1402(8). While this language is broad, some courts in Louisiana have read it narrowly, limiting the private cause of action to consumers and business competitors. Compare Morris v. Rental Tools, 435 So.2d 528, 533 (La.App. 5th Cir.1983) (limited right of action) with Jarrell v. Carter, 577 So.2d 120, 123 (La.App. 1st Cir.) (broad right of action), writ denied, 582 So.2d 1311 (1991). Neither the Supreme Court of Louisiana nor the Third Circuit Court of Appeal[7] have definitively addressed the split.
 
 
 33
 This court has, however, previously interpreted this part of the Act. In Delta Truck & Tractor v. J.I. Case Co., 975 F.2d 1192 (5th Cir.1992), we followed the narrow interpretation given by the courts and held that the private cause of action was limited to consumers and business competitors. Id. at 1205. The Providers do not fall within either of these categories. The rule in the Fifth Circuit is that one panel cannot overrule the decision of a prior panel. See, e.g., Broussard v. Southern Pac. Transp. Co., 665 F.2d 1387, 1389 (1982) (en banc). This is generally true as well for those situations where state law provides the rule of decision. Id. Nevertheless, we have recognized that, in this situation, what we are interpreting is state law, so if subsequent decisions of the state courts demonstrate that our prior decision was "clearly wrong" we will amend our position. Id. (quoting Lee v. Frozen Food Express, 592 F.2d 271, 272 (5th Cir.1979)). While our prior position is debatable given a split among the courts, no subsequent decisions of the courts of Louisiana demonstrate that the Delta Truck panel was clearly wrong and, therefore, our prior interpretation of the Act stands: there is no private cause of action for the Providers under the Unfair Trade Practices Act.
 
 III.
 
 34
 For the foregoing reasons, the district court's grant of summary judgment is reversed and the case is remanded for further proceedings consistent with this opinion, such proceedings to include a determination of the value of the lien property.
 
 
 35
 REVERSED and REMANDED.
 
 
 
 [1]
 At the beginning of this protracted litigation there were 25 lien claimants; as of now, only three remain. Of these, only LAJFP and Gardes are parties to this appeal
 
 
 [2]
 The Owners claimed jurisdiction under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356 (OCSLA). See further discussion in Part II.B
 
 
 [3]
 No party contests the validity of this order
 
 
 [4]
 We address briefly the district court's alternative holding that no cause of action could be pursued here because the Providers' claims were barred by laches. In Picone v. Lyons, 601 So.2d 1375, 1377 (La.1992), the Supreme Court of Louisiana noted that laches, as a common law doctrine, has no application in Louisiana. See La. Civ.Code Ann. art. 3457 ("There is no prescription except that established by legislation.") Under the law of prescription, the Providers' suit was filed timely. Further, the Lien Act does not impose a time limit for seeking sequestration
 
 
 [5]
 The Owners assert that the Providers should have proceeded to sequester the property if they were concerned that the Owners would ultimately act unfairly with respect to it. The Providers, however, state that they attempted to have the property seized but were told by the Louisiana authorities that they would not go into federal waters to seize it. Their attempt to have the U.S. Marshal's office seize it apparently failed as well
 
 
 [6]
 The Providers list an additional potential basis of liability in the form of American Bank & Trust Co. v. Shel-Boze, Inc., 527 So.2d 1052 (La.App. 1st Cir.), writ denied, 532 So.2d 155 (La.1988). We are unpersuaded. The court in that case assumed that an action for damages was available without citing any authority for it
 
 
 [7]
 As the events occurred in Cameron Parish, the decisions of this court would be binding for state law purposes. La.Rev.Stat. Ann. § 13:312