**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 98-11138
_____

JOHNNIE SHACKELFORD,

Plaintiff-Appellant,

v.

DELOITTE & TOUCHE, LLP,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

October 4, 1999

Before REYNALDO G. GARZA, HIGGINBOTHAM and DAVIS, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Johnnie Shackelford filed suit against her former employer, Deloitte & Touche, L.L.P. ("D&T"). Shackelford's suit alleges that D&T discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as well as other federal and Texas state laws. The district court granted a motion for summary judgment in favor of D&T on all of Shackelford's claims. For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

1

I.    FACTUAL AND PROCEDURAL BACKGROUND

The factual allegations in this case are quite detailed and are best laid out in chronological order. Shackelford, a black female, was employed by D&T as a tax processor from July 1, 1991 until her termination on October 13, 1995. Her duties included preparing tax returns, attaching filing instructions, ensuring that all necessary documents were sent to the client, and occasionally performing filing duties in a back-up capacity.

Shackelford's immediate supervisor was Caroline Korioth, the administrative supervisor and secretary to one of the tax partners at D&T. Korioth reported to Robert Chapman, the partner-in-charge of the tax department.

In January of 1994, a position as Chapman's secretary became open. Korioth was to be the supervisor for this position. According to Shackelford, Korioth told her that she would "probably be better off" remaining as a tax processor as the new position would not allow her to work as much overtime. Shackelford alleges that Korioth's comments discouraged her from applying for the new position, which was instead filled by a white woman who has since frequently worked overtime.

In April of 1995, Shackelford received the "Employee of the Month Award." Up through this time, all reviews of her work had been primarily positive. On May 11, 1995, a potential class action suit, alleging company-wide race discrimination, was filed in district court against D&T.[1] A joint statement was prepared in connection with that lawsuit and was ordered to be read to all potential class members. Shackelford, who was the only potential class member in Chapman's department, maintains that both Chapman and Korioth were aware of the suit during Shackelford's employment.

On August 24, 1995, Culver Wilson, the Human Resources director at D&T, had Shackelford read the joint statement and allegedly asked her whether she had experienced

---

[1] The district court refused to certify the class and dismissed the claims on July 3, 1996.

discrimination at D&T. Shackelford replied that she had, including mistreatment by Korioth. Shackelford claims that she then requested a meeting with Chapman and Wilson to discuss this alleged discrimination.

The next day, Shackelford received two negative performance evaluations. One evaluation, which was prepared by Chapman and dated July 18, 1995, found that Shackelford was "below requirements" in the areas of her ability to work with others, demeanor and flexibility. The other evaluation, which was prepared by Korioth and dated July 18, 1995, stated that Shackelford was below requirements in resolving interpersonal disputes, discussing and meeting deadlines, and handling stress. Korioth and Shackelford disagree as to whether Shackelford was made aware of these criticisms before the evaluations were issued. Prior to reviewing the evaluations with Shackelford, Korioth added an addendum, dated August 25, indicating that Shackelford's performance had improved since July.

Shackelford claims that Korioth's criticisms regarding her interpersonal skills arose from Shackelford's having come to Korioth with her problems concerning Lisa Stevens, a white co-worker. Shackelford maintains that Stevens did not receive low scores, even though she complained to Korioth about Shackelford.

At this point Shackelford had not yet joined the class action suit but she did contact the class counsel more than once between August 24, 1995 and her termination. D&T personnel, who were not involved in the decision to terminate Shackelford, warned her that participation in the lawsuit could mean losing her job.

On August 28, 1995, Shackelford requested training on new computer software used for filing because, on occasion as a back-up duty, she could be required to assist in that task. This request was denied. Korioth trained Lisa Stevens, a white file clerk and back-up tax processor, on the new system.

On September 15, 1995, Shackelford again requested a meeting with Wilson and Chapman to discuss her relationship with Korioth. Wilson replied that he would be out of the

3

office for up to ten days and that Shackelford could wait for his return or meet with Korioth alone. Wilson maintains that he heard nothing further from Shackelford about such a meeting.

On October 6, 1995, Shackelford was included on a list of potential witnesses in the class action lawsuit. On October 12, 1995, at around six p.m., Shackelford removed several returns from the in/out box. D&T alleges that Shackelford had been advised to leave surplus returns so that other staff could work on them. Late that evening, Korioth asked Shackelford if she needed assistance in finishing the returns because penalties would accrue if they missed the October 15 deadline. Shackelford declined, claiming that the work was "ninety percent done." In fact, the work was timely completed. In reaction to this incident, Korioth criticized Shackelford for not being a "team player," to which Shackelford responded that there was not time to be one. Additionally, Korioth maintains that Shackelford faced similar difficulties regarding meeting deadlines in September of 1995 and had been counseled about the need to avoid such problems. In contrast, Shackelford maintains that she asked for help on October 12, did not receive it in a timely fashion, and subsequently refused help after it was too late.

At some time on October 12, Shackelford contacted Wilson to set up a meeting with him and Chapman. It is unclear whether this contact occurred before or after the incident with Korioth. Korioth claims that she told Wilson about this incident on the morning of October 13. According to D&T, it made the decision to terminate Shackelford that morning. However, Shackelford asserts that during her lunch break on that same day, Korioth overheard Shackelford speaking on the phone with a class counsel representative. Shackelford was terminated that afternoon and replaced with a Hispanic employee. After terminating Shackelford, Chapman sent a voice male to all the tax department's professionals, which stated that Korioth had invested a "considerable amount of time in assisting Johnnie [Shackelford] to . . . overcome her belief that she was being discriminated against."

On January 13, 1997, Shackelford filed this lawsuit against D&T, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; 42 U.S.C. § 1981; and the

Texas Commission on Human Rights Act, Tex.Labor.Code § 21.001, et seq. ("TCHRA").

Specifically, Shackelford claims that D&T wrongfully terminated her because of her race and in retaliation for engaging in activity protected by Title VII. She also claims that D&T discriminatorily (1) denied her promotion, (2) gave her unfair performance evaluations, and (3) denied her training. D&T claims that Shackelford was terminated because of her inability to get along with co-workers or to handle her caseload. The district court granted D&T's motion for summary judgment. This appeal followed.

## II. STANDARD OF REVIEW

This court reviews a district court's grant of a motion for summary judgment *de novo* and applies the same criteria employed by the district court. *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994). Therefore, this court will reverse the district court's ruling only if it determines that the pleadings, affidavits, and other evidence establish that there is a genuine issue of material fact and that D&T is not entitled to judgment as a matter of law. *Gardes Directional Drilling v. United States Turnkey Explor.*, 98 F.3d 860, 864 (5th Cir. 1996). *See also,* FED.R.CIV.P. 56(c). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

## III. DISCUSSION

The general issue on appeal is whether the district court erred in granting summary judgment in favor of D&T on Shackelford's Title VII claims.[2] Shackelford claims that D&T discriminated against her because of race in (1) the termination of her employment; (2) the denial of promotional opportunities; (3) the issuance of negative performance evaluations; and (4) the

---

[2] Although Shackelford bases her claims on Title VII, 42 U.S.C. § 1981, and the TCHRA, this court shall refer only to Title VII in this opinion. When used as parallel causes of action, Title VII and section 1981 require the same proof to establish liability. *Bunch v. Bullard*, 795 F.2d 384, 387 n.1 (5th Cir. 1986). Similarly, the law governing claims under the TCHRA and Title VII is identical. *Colbert v. Georgia-Pacific Corp.*, 995 F.Supp. 697 (N.D. Tex. 1998). Because these three statutory bases are functionally identical for the purposes of Shackelford's claims, it would be redundant to refer to all of them.

denial of training. For the following reasons, we affirm summary judgement of these discrimination claims. Next, Shackelford claims that D&T terminated her in retaliation for activity protected by Title VII. For the following reasons, we reverse summary judgement of the retaliation claim and remand for further proceedings.

### A. Race Discrimination Claims

In order to overcome a motion for summary judgment on her Title VII discrimination claims, Shackelford must first establish, by a preponderance of the evidence, a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-803 (1973). A prima facie case is established once the plaintiff has proved that she (1) is a member of a protected class; (2) was qualified for her position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class. *See Ward v. Bechtel Corp.,* 102 F.3d 199, 202 (5th Cir. 1997). The prima facie case, once established, raises a presumption of discrimination, which the defendant must rebut by articulating a legitimate, nondiscriminatory reason for its actions. *See Meineke v. H&R Block*, 66 F.3d 77, 83 (5th Cir. 1995) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248. 254 (1981)). If the defendant satisfies this burden, the plaintiff must prove that the proffered reasons are pretextual. Once a Title VII case reaches the pretext stage, the only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination. *See Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (noting that once a Title VII case reaches the pretext stage, the sufficiency of the evidence test is applied).

### 1. Termination

Shackelford claims that she was fired because of her race in violation of Title VII. Since this claim reached the pretext stage[3], the issue on appeal is whether the totality of the evidence,

---

[3] In addressing D&T's summary judgment motion, the district court held that Shackelford's qualifications raised a genuine issue of material fact for the purpose of the prima facie case. Therefore, the burden shifted to D&T to articulate a legitimate, non-discriminatory reason for Shackelford's termination. D&T claimed the reasons for her termination was her inability to properly handle her workload or to get along with her co-workers. The district court held that Shackelford

including the evidence raised at the prima facie case and pretext stages, raises a genuine issue of material fact as to whether D&T fired Shackelford because of her race. *Id.* According to D&T, Shackelford was terminated because she experienced interpersonal difficulties with her co-workers, held projects to the last minute while hoarding work, and left her desk for long periods of time.

In response, Shackelford presented the following evidence that D&T's legitimate, non-discriminatory reasons for her termination were pretextual. First, she stresses her qualifications for the job, including that: (1) she performed the job for four years; (2) she received regular raises in her position; and (3) she received favorable reviews for a period of almost four years including the April, 1995 Employee of the Month award. Second, Shackelford alleges that she was treated differently than similarly situated workers from outside her protected class. As to the interpersonal difficulties Shackelford faced, she points out that while she and a white co-worker complained about each other, only Shackelford received low performance reviews for interpersonal skills. Moreover, some of the workers Shackelford complained about were eventually fired for poor job performance. That same white co-worker was trained on a filing program while Shackelford was denied such training. She cites one incident in four years where Korioth told all the white co-workers about a change in tax processing formats, while leaving out only Shackelford, who was the only African-American tax processor at D&T. Shackelford claims that she was the only employee required to leave notes reporting her whereabouts. As to her allegedly poor performance, Shackelford disputes D&T's account of her hoarding tax returns during the busy September and October tax periods. *See* infra at p. 17.

Finally, Shackelford attempted to produce evidence of racial discrimination at D&T. She claims to have observed discrimination against other African-Americans. She also presented the declarations of five African-American employees in the Dallas office of D&T, each of whom

---

failed to produce evidence that D&T's concern with her work performance was a pretext for discrimination and granted summary judgment on D&T's behalf.

stated that they suffered and witnessed racially discriminatory treatment at D&T.

We conclude that this evidence, even when viewed in the light most favorable to Shackelford, is insufficient to create a jury question regarding the discriminatory termination claim. Arguably, there is a dispute of fact as to whether Shackelford performed badly or was to blame for disputes with fellow employees. However, this dispute alone is insufficient to support an inference of racial discrimination where, as here, the remaining evidence is too speculative and too reliant on isolated incidents to survive summary judgment.[4] First, the observations by Shackelford and her witnesses regarding racial discrimination are in the form of unsupported conclusions.[5] *See Swanson v. Gen. Serv. Admin.,* 110 F.3d 1180, 1186 (5th Cir. 1997) (noting that bare allegations of racial discrimination are too speculative to create a jury question) (citations omitted).

Similarly, the rest of the evidence is based in one or two isolated incidents and comparisons to non-similarly situated workers. For example, Shackelford refers to the one time in four years where Korioth allegedly forgot to tell Shackelford about a change in policy[6] and one time where a white co-worker was not given a poor review of her interpersonal skills despite having complained about Shackelford. Indeed, there was no evidence that that white co-worker was perceived to have engaged in the same pattern of complaining about several co-workers as was Shackelford. Moreover, there was no evidence that those employees who were not required to report their whereabouts, shared Shackelford's habit of taking lunch at unusual times. Thus

---

[4] In our analysis of Shackelford's retaliation claim, we note that the factual dispute over Shackelford's performance was merely one piece of the evidence that supported an inference of retaliation when combined with other significant evidence such as the suspicious timing between her protected activity and her termination. However, evidence sufficient to support a claim of retaliation is not necessarily sufficient to support a claim of discrimination "because of" race.

[5] The testimony of the African-American declarants does not even allege discrimination by the individuals who terminated Shackelford. Moreover, the district is correct that this testimony is speculative as to whether there is a pattern of discrimination at D&T. Given that these instances have not been linked to Shackelford's termination, they are insufficient to support the inference that Shackelford was fired because of her race.

[6] Shackelford concludes, without evidence, that this was an attempt by Korioth to embarrass her.

**8**

those employees were not similarly situated. Finally, the fact that Shackelford was denied the filing software training that Lisa Stevens, a white co-worker, was granted, does not support an inference of discrimination. Shackelford admits that she would only perform filing duties occasionally and as a back up duty whereas filing was one of Stevens' primary duties. Due to the excessively speculative nature of the aforementioned evidence of discrimination, we affirm summary judgment of Shackelford's termination claim.

### 2. Failure to promote

We affirm the district court's grant of summary judgment of Shackelford's failure to promote claim. Shackelford claims that she never formally applied for the position of executive secretary because she was discouraged by Korioth, the supervisor to the new position. Korioth told her that although the position offered a higher base salary, she would "probably be better off" remaining as a tax processor because the new position would not allow her to work as much overtime. The executive secretary position was eventually filled by a white woman and it did potentially require significant overtime.

Shackelford's failure to apply for the position does not bar her claim if she can show that such an application would have been a futile gesture. *See Teamsters v. United States,* 431 U.S. 324, 363-66 (1977); *Claiborne*, 583 F.2d 143, 150 (5th Cir. 1978). Making such a claim usually requires a showing that the applicant for the promotion was deterred by a known and consistently enforced policy of discrimination. *See Teamsters,* 431 U.S. at 363-66 (noting that a consistently enforced discriminatory policy can surely deter job applications from those who are aware of it an are unwilling to subject themselves to the humiliation of explicit and certain rejection); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir. 1993). As discussed, the evidence that D&T had such a policy of discrimination is speculative at best. *See* supra at p. 9-10. Moreover, Korioth's statement that Shackelford would "probably be better off" in the old position can not be reasonably interpreted as a suggestion that Shackelford had no chance at getting the promotion. Nor would applying be a futile gesture just because the position could include less overtime.

Accordingly, we affirm summary judgment of this claim on behalf of D&T.

### 3. Denial of training

Shackelford alleges that D&T discriminatorily refused to train her on specialized filing software. The district court held that denying training to an employee is not an adverse employment action covered by Title VII. Consequently, the district court granted summary judgment of this claim. In *Dollis v. Rubin*, 77 F.3d 777 (5th Cir. 1995), a retaliation claim, this court held that an employer's refusal to allow a certain employee to attend training sessions did not effect a material adverse change in the terms or conditions of the plaintiff's employment, and thus did not constitute an ultimate employment decision. *Id.* at 779, 782.

Shackelford responds that the "ultimate employment decision" standard outlined in *Dollis*, a retaliation case, is inapplicable to her claim of race discrimination. She argues that her discriminatory failure to train claim should be held to a lighter "tend to adversely affect" standard. *See Mattern,* 104 F.3d 702, 708 (5th Cir. 1997) (noting the import of the *Dollis* case is that Title VII's anti-retaliation provision refers to ultimate employment decisions and that the retaliation provision contains no mention of the vague harms of the discrimination provision of Title VII, which is "much broader" and reaches activity which would "tend to" adversely affect the employee). However, her claim fails this test as well. Shackelford claims only that her position may occasionally have required her to use the new software to fulfill her back-up duties. She produces no significant evidence that a denial of such training would "tend to affect" her employment status or benefits.[7] Thus there is no reasonable basis on which to conclude that a denial of such training, so peripheral to Shackelford's main duties as a tax processor, would "tend to" result in a change of employment status, benefits or responsibilities. Thus a denial of such training is not an adverse employment action covered by Title VII. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742; 118 S.Ct. 2257, 2268 (1998) (noting, in a sexual harassment case, that "a

---

[7] At most, Shackelford alleges that filing was one of various back-up duties that, in total constituted 15% of her work. She does not alleged that filing, on its own, was a significant part of her job.

**10**

tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") Therefore, the district court did not err in granting summary judgment on this claim.

### 4. Unfair and biased evaluations

Shackelford argues that the district court erred in finding that the alleged unfair and biased evaluations did not amount to an adverse employment action covered by Title VII.[8]

.In *Mattern,* this court warned against "expand[ing] the definition of 'adverse employment action' to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee -- anything which might jeopordize employment in the future." *Mattern,* 104 F.3d at 708.[9]     However, we need not address whether bad reviews, without more, could ever qualify as an adverse employment action.    Even assuming, arguendo, that they can, Shackelford failed to bring sufficient evidence that these reviews were the result of discrimination.   Her evidence of discrimination regarding the bad reviews adds nothing to her evidence of discrimination regarding her termination.    We have already found that the latter was insufficient to create a jury question.   *See* supra at p. 8-10.[10] It follows that the district court correctly granted summary

---

[8] The district court relied on *Mattern v. Eastman Kodak Co.,* 104 F.3d at 708, a retaliation case in which this court held that documented reprimands are not an adverse employment action even though they increase the chance of an adverse employment action.

 As discussed, *supra* at p.
11-12, Shackelford responds that *Mattern* can not be read to limit discrimination claims to ultimate employment decisions.

[10] Any additional evidence regarding the bad reviews is speculative.  For example, Shackelford provides no evidence to support her allegations that the performance evaluations were backdated or that D&T departed from its own policy of giving the employer any bad reviews as soon as possible.

judgment on her claim regarding unfair reviews.

### B. *Retaliation Claim*

After reviewing the record and the parties' briefs, we find that summary judgment of Shackelford's retaliation claim is improper because she produced sufficient evidence to support an inference that retaliation was the "but for" cause of her termination. We therefore reverse the district court's grant of summary judgment on behalf of D&T on Shackelford's retaliation claim and remand for further proceedings.

Since this case reached the pretext stage, the only question on summary judgments is whether the evidence of retaliation, in its totality, supports an inference of retaliation. *See Rhodes,* 75 F.3d at 993 (noting that once a Title VII case reaches the pretext stage, it is treated like any other summary judgment case and the sufficiency of the evidence test is applied). It is still helpful, however, to review the essential facts in terms of each party's burden of proof.

A plaintiff establishes a prima facie case of retaliation by showing: (1) that she engaged in activity protected by Title VII; (2) that an adverse employment action occurred; and (3) that there was a causal connection between the participation in the protected activity and the adverse employment decision. *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 41 (5th Cir. 1992). The establishment of a *prima facie* case gives rise to an inference of retaliation. *Id.* This inference, in turn, shifts the burden of proof to the defendant, who must then articulate a legitimate non-discriminatory reason for the challenged employment action. *Id.* Once D&T asserted such a

**12**

reason - i.e., that Shackelford was fired due to her inability to manage her caseload or to get along with her co-workers - the inference of discrimination raised by the *prima facie* case dropped from this case. At this point, summary judgment is appropriate unless Shackelford can prove that D&T's rational is pretextual. *McDonnell Douglas,* 411 U.S. at 801-803.

In addition, this circuit has held that where there is a close timing between an employee's protected activity and an adverse employment action, the employer must offer "a legitimate, nondiscriminatory reason that explains both the adverse action *and the timing*." *Swanson*, 110 F.3d at 1188 (emphasis added). Shackelford has demonstrated a tight temporal proximity between her protected activity and her termination. Shackelford was fired on October 13. This is the same day on which Shackelford alleges that Korioth, her supervisor, overheard her speaking on the phone with the class action plaintiffs' counsel; one day after she attempted to set up a meeting with her supervisors to discuss racial discrimination against her; and one week after she was listed as a potential witness in the class action suit. After four years of positive reviews, Shackelford received her first negative performance appraisals in August of 1995, after the potential class action suit was filed against D&T in May of 1995. Although D&T alleges that Shackelford hoarded returns as early as September, she was not fired until October, just as her involvement in the class action suit was increasing. Indeed, Korioth admitted that Shackelford's performance had improved since the negative reviews had been completed. Shackelford alleges that D&T failed to show her the bad reviews until one month after they were allegedly completed.

D&T offered the following explanation for the timing of Shackelford's termination. Korioth testifies that she contacted Chapman on the morning of October 13 after observing Shackelford's poor performance during the October busy season. Additionally, Korioth alleges that similar events took place during the busy September season and that she had counseled Shackelford about them. Korioth claims that on October 12, Shackelford was hoarding returns despite having been previously advised to leave surplus returns available to other workers. Based

13

on these events, she recommended to Chapman on the morning of October 13, that Shackelford be terminated after the filing deadline of October 15. Later that day, Shackelford was fired. Chapman explained that "if we were going to terminate somebody, we were going to do it now as opposed to later." Shackelford's allegedly poor performance during the October busy season, as well as the charge that she got along poorly with her fellow employees, is a legitimate, non-discriminatory justification of the timing of her termination.

Shackelford therefore bears the burden of producing evidence that this justification was pretextual. Merely disputing D&T's assessment of Shackelford's work performance will not necessarily support an inference of pretext. *See Armstrong v. City of Dallas,* 997 F.2d 62 (5th Cir. 1993) (noting that it is not the defendant's burden to prove that its legitimate non-discriminatory rational is correct); *Smith v. St. Regis Corp.,* 850 F.Supp 1296, 1318 (S.D. Miss. 1994), *aff'd,* 48 F.3d 531 (5th Cir. 1995) (noting that an honest belief in a non-discriminatory reason for discharge, even if incorrect, is not discrimination) (citing *Wright v. Western Elec. Co., Inc,* (664 F.2d 959, 964). The issue is whether D&T's *perception* of Shackelford's performance, accurate or not, was the real reason for her termination. Indeed, the ultimate issue on summary judgment is whether Shackelford produced evidence which could support a finding that she would not have been fired in the absence of her having engaged in protected conduct. *Long v. Eastfield College*, 88 F.3d 300, 304 n.4 (5th Cir. 1996) ("ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse employment decision") (citing *McDaniel v. Temple Indep. Sch. Dist.,* 770 F.2d 1340, 1346 (5th Cir. 1985)).

Shackelford presents the following types of evidence to rebut D&T's claim that she was fired because of her bad performance or interpersonal skills. First, there is the aforementioned temporal proximity between her protected activity and her termination. *See* supra at p. 14-15. Second, while D&T claims that the "decision to terminate Shackelford's employment was precipitated by the events of October 12, 1995," Shackelford disputes D&T's account of her

**14**

hoarding tax returns on that day.  She maintains that the reports did not arrive until 6 p.m.,  that she asked for help before the reports arrived on that day, and that she did not receive such help in a timely fashion.  According to Shackelford, she only refused help after she felt it was too late to accept it and the returns were ninety percent done.  Moreover, Shackelford does not admit that "similar incidents" of hoarding occurred during the busy September tax season.

Third, Shackelford alleges that various D&T employees, who are not involved in the decision to terminate her, warned her not "to get involved [in the class action suit against D&T] if you [Shackelford] want to keep your job."  Finally, as to Shackelford's ability to get along with her employees, she argues that a similarly situated white employee was not given poor reviews for interpersonal skills[11] and that the employees whose job performance she complained about were, in fact, fired for poor job performance.

We find that the evidence on the record, when viewed in its totality and in the light most favorable to Shackelford, is sufficient to create a genuine issue of material fact as to whether D&T fired Shackelford in retaliation for activities protected by Title VII.  A reasonable jury could choose to believe Shackelford's account of the events leading up to her termination, and accordingly conclude that Shackelford did not hoard tax returns.[12]  This finding alone might not be enough to support an inference of retaliation, but it could cast some doubt on D&T's proffered rational.  This source of doubt is then combined with both the suspicious timing of Shackelford's termination in tight proximity to her protected activity and the other evidence of pretext.  The totality of this evidence is sufficient to support the inference that D&T did not actually believe that Shackelford's performance was poor, but instead terminated her in retaliation for her

---

[11] Both Shackelford and Lisa Stevens, a white co-worker, complained about each other to their supervisors.  Apparently only Shackelford received poor reviews for interpersonal skills.

[12] At one point in her deposition, Shackelford may have suggested that her supervisor could have perceived that she needed help completing the returns.  However, a reasonable jury could interpret these ambiguous comments in many ways.  Thus, when viewing the evidence in its totality and in the light most favorable to Shackelford, this isolated suggestion would not necessarily prevent a reasonable juror from concluding that Shackelford was fired because of her protected activity.

protected activity.  Indeed, the combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment.  *See, e.g., Long,* 88 F.3d at 308 (reversing grant of summary judgment on plaintiff's retaliation claim where employee's past evaluations had been positive up until time of protected activity, and no other employee had been terminated for same behavior); *Shirley,* 970 F.2d at 42-43 (affirming district court's judgment for plaintiff on Title VII retaliation claim where plaintiff's performance evaluations were excellent prior to EEOC complaint, and where supervisor became increasingly abusive after filing of EEOC complaint).

In conclusion, we find that a reasonable juror could conclude that D&T fired Shackelford in retaliation for her protected activity.  Therefore, the district court's grant of D&T's motion for summary judgment on Shackelford's retaliation claim is reversed and that claim is remanded for further proceedings.

## IV.    CONCLUSION

For the foregoing reasons, we AFFIRM IN PART, REVERSE IN PART, and REMAND FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.